**EXHIBIT 1**

**Unpublished Cases Involving the University of Michigan**

**Gong v. University of Michigan, 2019 WL 7598905, at \*2 (6th Cir. Oct. 17, 2019).**

**Klein v. University of Michigan, 2018 WL 1614090, at \*11 (E.D. Mich. Feb. 23, 2018).**

**Martinson v. Regents of the Univ. of Michigan, 2011 WL 13124122, at \*4 (E.D. Mich. Sept. 28, 2011).**

**Odom v. University of Michigan, 2017 WL 2117978, at \*5 (E.D. Mich. May 16, 2017).**

**Zarza v. Board of Regents of Univ. of Michigan, 2019 WL 35536707, at \*2 (E.D. Mich. Aug. 5, 2019).**

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.206 Filed 02/18/21 Page 2 of 42

Gong v. University of Michigan, Not Reported in Fed. Rptr. (2019)

2019 WL 7598905

2019 WL 7598905
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

Yusong GONG, Plaintiff-Appellant,

v.

UNIVERSITY OF MICHIGAN,
et al., Defendants-Appellees.

No. 19-1068
|
FILED October 17, 2019

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Yusong Gong, Pro Se

David John Masson, Assistant General Counsel, University
of Michigan, Office of the General Counsel, Ann Arbor, MI,
for Defendants - Appellees

Before: NORRIS, SILER, and SUTTON, Circuit Judges.

<u>ORDER</u>

**\*1** Yusong Gong, a pro se Michigan resident, appeals
the district court's judgment dismissing her complaint and
granting summary judgment in favor of the defendants in
her action brought under Title VII of the Civil Rights Act
of 1964 ("Title VII") and the Americans with Disabilities
Act ("ADA"). This case has been referred to a panel of the
court that, upon examination, unanimously agrees that oral
argument is not needed. *See* Fed. R. App. P. 34(a).

In 2016, Gong brought this action against the University of
Michigan ("University") and its employees Richard Simon,
Michelle Henderson, and Timothy Lynch. She alleged that the
defendants: (1) retaliated against her for reporting scientific
misconduct and based on her gender and nationality by
terminating her employment and refusing to rehire her, in
violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*;
(2) discriminated against her by failing to accommodate
her "major depressive disorder" and "Ergonomic disorders,"
Compl. at 3, 7, in violation of the ADA, 42 U.S.C. §

12112(a) and (b); and (3) utilized a policy that employees
must be best qualified for a vacant position when reassigned
to accommodate a disability, in violation of 42 U.S.C.
§ 12112(a) and (b). After the defendants filed a motion
to dismiss, the district court partially granted the motion,
dismissing any ADA claims for monetary damages as
barred by Eleventh Amendment immunity and dismissing the
individual defendants as not subject to liability under Title VII
or the ADA. The district court allowed Gong's ADA claim
seeking reinstatement and her retaliation claim under Title
VII to proceed against the University. Gong twice sought to
amend her complaint to add a First Amendment retaliation
claim, but the district court denied both of her motions.
The district court ultimately granted summary judgment in
favor of the defendants, finding that Gong had failed to
exhaust her administrative remedies, that the enforcement of
a prior settlement agreement between the parties collaterally
estopped Gong from challenging the agreement in this case,
and that the release in the prior settlement barred her claims.

The present appeal relates to two previous lawsuits filed
by Gong concerning the termination of her employment.
In 2012, Gong filed a pro se lawsuit in Michigan state
court against the University and another employee alleging
discrimination and retaliation ("State Case"). In 2013, Gong,
represented by counsel, filed a second lawsuit in federal
court, alleging retaliation under the Rehabilitation Act ("First
Federal Case"). At a hearing and status conference in the
First Federal Case, Gong signed a settlement agreement—
formalized on the record—releasing her claims against the
University relating to her employment and termination in
exchange for $41,000. The agreement also provided that
Gong would execute a W-9 form as a precondition of
payment, that she would not seek reemployment with the
University, and that the agreement could be revoked only by
submitting a revocation in writing to the University's general
counsel within seven days. The district court then dismissed
the First Federal Case with prejudice. Gong has since refused
to submit an executed W-9, instead attempting to renegotiate
the terms of the settlement. The University has indicated that
it is prepared to transfer payment to Gong as soon as she
submits her W-9. The agreement was then used as the basis
for dismissing the State Case.

**\*2** On appeal, Gong argues that: (1) the district court
should not have granted the defendants extensions of time
to respond to her complaint in the First Federal Case; (2)
the extensions in the First Federal Case "provided defendants

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.207 Filed 02/18/21 Page 3 of 42

Gong v. University of Michigan, Not Reported in Fed. Rptr. (2019)
2019 WL 7598905

a valid excuse to ask EEOC to dismiss plaintiff's EEOC charge of ADA [violations], and assisted defendants to use a settlement agreement for covering up misconducts [sic]," Appellant's Br. at 18 (D. 12, at 20); (3) the district court erred by concluding that the 2013 settlement agreement was valid; (4) the defendants allegedly lied to the district court about whether her attorney filed a motion for reinstatement of the State Case and whether her attorney represented her at the dismissal hearing in the State Case; (5) the district court should have allowed her to amend her present complaint to add a whistleblower claim; (6) the district court assisted the defendants in covering up scientific misconduct; (7) the settlement agreement should not apply to the defendants' harassment of her for seeking reinstatement and for reporting misconduct; and (8) the defendants should not be entitled to sovereign immunity.

### Dismissal of Individual Defendants and Claims for Monetary Damages Against the University

We review de novo the district court's dismissal of a complaint under Rule 12(b)(6). See Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 481 (6th Cir. 2009). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The Eleventh Amendment "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." Thiokol Corp. v. Dep't of Treasury, 987 F.2d 376, 381 (6th Cir. 1993) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100-01 (1984)). This court has held that the University qualifies as an arm of the state of Michigan, see Estate of Ritter v. Univ. of Mich., 851 F.2d 846, 848-51 (6th Cir. 1988), and Gong provides no evidence that the University waived its immunity in this case. Gong explicitly brought her claims under Title I of the ADA, and thus she cannot sue the University for monetary damages. See Whitfield v. Tennessee, 639 F.3d 253, 257 (6th Cir. 2011) (citing Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 (2001)).

The district court also dismissed Gong's Title VII and ADA claims against the individual defendants because they were not proper defendants under the ADA or Title VII. This determination was correct because individual employees or supervisors cannot be held personally liable under Title VII or the ADA. See Wathen v. Gen. Elec. Co., 115 F.3d 400, 404-05 (6th Cir. 1997) (Title VII); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 808 n.1 (6th Cir. 1999) (ADA).

Gong twice sought to amend her complaint to add a First Amendment claim of retaliation. The district court denied these motions because adding the claim under 42 U.S.C. § 1983 would be futile due to the University's entitlement to sovereign immunity, and because of the undue delay and prejudice that would result from an amendment so late in the proceedings. A district court should "freely" grant a party leave to amend her complaint "when justice so requires." Fed. R. Civ. P. 15(a). "A court need not grant leave to amend, however, where amendment would be 'futile.' " Miller v. Calhoun County, 408 F.3d 803, 817 (6th Cir. 2005) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). We ordinarily review the denial of a motion to amend a complaint for an abuse of discretion, see Williams v. City of Cleveland, 771 F.3d 945, 949 (6th Cir. 2014), but where the district court has denied leave to amend based on its legal conclusion that amendment would be futile, we review whether the proposed amended complaint "contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,' " id. (quoting D'Ambrosio v. Marino, 747 F.3d 378, 383 (6th Cir. 2014)).

**\*3** When Gong sought to amend the complaint for the first time, the only remaining defendant was the University. Because Gong specifically sought monetary damages for the claim that she sought to amend, the claim was barred against the University by the Eleventh Amendment and was therefore futile. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989) (reaffirming that Congress did not intend by the language of § 1983 to override the states' Eleventh Amendment immunity). Insofar as Gong sought to reinstate the previously dismissed individual defendants, she had the heavy burden of proving, for example, that the additional evidence and claims that she sought to present were previously unavailable or that the district court's decision resulted from a clear error of law. See Leisure Caviar, LLC

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.208 Filed 02/18/21 Page 4 of 42

Gong v. University of Michigan, Not Reported in Fed. Rptr. (2019)
2019 WL 7598905

*v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010). She has not satisfied this standard. The district court also did not abuse its discretion by denying Gong's second motion to amend the complaint because it was filed after the close of discovery and thus would cause undue delay and undue prejudice to the defendant. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999).

**Grant of Summary Judgment**

Remaining are Gong's claims under Title VII and the ADA seeking the reinstatement of her employment at the University. We review the district court's grant of summary judgment de novo. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Summary judgment is appropriate when the evidence presented shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

Before filing suit in federal court, a plaintiff alleging employment discrimination must file a timely charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1), (f)(1). If the EEOC dismisses the charge, it must notify the plaintiff of the dismissal and of the right to bring a civil action, and the plaintiff must do so within ninety days after receiving the right-to-sue letter. *See id.* § 2000e-5(f)(1); 29 U.S.C. § 626(e); *see also* 42 U.S.C. § 12117(a) (incorporating the "powers, remedies, and procedures" in § 2000e-5 to ADA proceedings). This court presumes "that notice is given, 'and hence the ninety-day limitations term begins running, on the fifth day following the [ ] mailing of [a right-to-sue] notification to the claimant[ ].' " *Rembisz v. Lew*, 830 F.3d 681, 682 (6th Cir. 2016) (alterations in original) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000)). Gong presented a February 12, 2013, EEOC charge relating to her 2012

termination and an April 10, 2013, "Right to Sue Letter" in her motion for reconsideration of the grant of summary judgment. The present lawsuit was filed on December 28, 2016. Accordingly, any claims relating to her discharge are barred.

Gong filed another an EEOC charge on July 18, 2016, alleging that the University had discriminated against her by denying her job application in January of 2016, and she was issued a "Right to Sue Letter" on October 6, 2016. The charge did not include any allegation other than that her job application was rejected, and thus her claims of retaliation that preceded the charge—including that she was denied medical treatment by the University—are unexhausted. *See, e.g., Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853-54 (6th Cir. 2000).

Gong's claim that the University discriminated against her by rejecting her job application in January 2016 is barred by the terms of her settlement agreement from the First Federal Case. The agreement states:

> *4 Yusong Gong agrees not to be employed by, apply for or otherwise seek or accept employment with, or provide any personal services to or for U of M or any of the Released Parties, and entry into this agreement and payment of the sums specified above shall be sufficient ground, and a legitimate non-discriminatory and non-retaliatory basis to reject any such application or terminate any such employment. Yusong Gong and the Releasing Parties agree such rejection or termination shall not be the basis for any claim, complaint or cause of action by her against any of the Released Parties. Yusong Gong understands that her status with U of M will remain not eligible for rehire.

R. 72-6, at 4-5. Such a no-rehire restriction is valid if it was the intent of the parties to permanently take Gong out of the University's labor pool. *See Adams v. Philip Morris*, 67 F.3d 580, 584-85 (6th Cir. 1995). The language of the agreement clearly demonstrates such intent.

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.209 Filed 02/18/21 Page 5 of 42

Gong v. University of Michigan, Not Reported in Fed. Rptr. (2019)
2019 WL 7598905

Gong's arguments that the settlement agreement was not entered into knowingly and voluntarily also fail.

> In evaluating whether a release has been knowingly and voluntarily executed, we look to (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Id.* at 583. At the time she signed the agreement, Gong was a forty-nine-year-old, college-educated medical researcher. She was represented by counsel, and the parties had been engaged in settlement discussions for several months. The settlement agreement was clear, and the University is in compliance with the agreement and stands ready to make the payment of $41,000 as soon as Gong submits her W-9. Moreover, the district court in the First Federal Case questioned Gong on the record as to whether she understood the terms of the settlement agreement and whether she agreed to it without coercion. Gong had a friend with her that day, Dr. Douglas Smith, who also stated on the record that he believed that

Gong was able to understand and communicate effectively with her attorney. Gong did not submit any evidence to back up her assertions that her attorney yelled at her or threatened to kick her in the leg, and she clearly testified at the hearing that she was entering into the agreement freely and voluntarily. Moreover, she did not present any evidence, beyond her allegations, that the University was involved in any coercion by her attorney. Nor did she present competent medical evidence that she lacked the mental capacity to enter into the settlement agreement under Michigan contract law. *See Vittiglio v. Vittiglio,* 824 N.W.2d 591, 597 (Mich. Ct. App. 2012) (holding that a plaintiff would have to show that "she did not even comprehend the nature or terms of the agreement"). Gong also did not satisfy the requirements for revoking the settlement agreement explicitly set out therein, and her decision not to sign a clean copy of the agreement incorporating the handwritten changes to which the parties agreed on the record did not serve to abrogate the original agreement.

Finally, Gong does not present any evidence in support of her assertion that the district court accepted bribes, and any questions about the propriety of extensions of time granted in a prior, concluded lawsuit should have been appealed in that case.

Accordingly, we **AFFIRM** the district court's judgment.

**All Citations**

Not Reported in Fed. Rptr., 2019 WL 7598905

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)

2018 WL 1614090

2018 WL 1614090
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Dennis KLEIN, Plaintiff,

v.

UNIVERSITY OF MICHIGAN, BOARD
OF REGENTS, et al., Defendants.

Civil Action No. 17-11192
|
Signed 02/23/2018

**Attorneys and Law Firms**

Dennis Klein, Fenton, MI, pro se.

David J. Masson, University of Michigan Office of the
General Counsel, Ann Arbor, MI, for Defendants.

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANTS' MOTION TO DISMISS [15],
AND TO DISMISS PLAINTIFF'S COMPLAINT**

DAVID R. GRAND, United States Magistrate Judge

**\*1** *Pro se* plaintiff Dennis Klein ("Klein") brings this action
against the University of Michigan Board of Regents, the
University of Michigan Medical Center, and eight University
of Michigan employees in their "personal and professional
capacities": Jim Harvey ("Harvey"), Bob Harris ("Harris"),
Bill O'Dell ("O'Dell"), Chris Schlaps ("Schlaps"), Maria
Brussolo ("Brussolo"), Luis Mello ("Mello"), Denise Siebert
("Siebert"), and Cindy Quine ("Quine") (collectively, the
"Defendants"). (Doc. #13 at 2). This case was referred to
the undersigned for management, hearing, and determination
of all pretrial matters pursuant to 28 U.S.C. § 636(b)
(1)(A), and for any reports and recommendations on
dispositive matters that may be necessary pursuant to 28
U.S.C. § 636(b)(1)(B). (Doc. #8). Presently before the
Court is Defendants' motion to dismiss, filed on October
13, 2017. (Doc. #15). For the reasons discussed below,
**IT IS RECOMMENDED** that the motion to dismiss be
**GRANTED**, and that Klein's complaint be **DISMISSED**.

**I. Factual Background**

Beginning in 2008, Klein was an employee in the
University of Michigan Medical Center's Facility Planning
and Development Department ("FPD"). (Doc. #13 at ¶ 1). The
Defendants are all affiliated with the FPD in some capacity.
As discussed in more detail below, in his operative second
amended complaint, Klein asserts numerous claims arising
out of his employment, including intentional infliction of
emotional distress ("IIED"), invasion of privacy, negligent
hiring and retention, failure to provide a safe workplace,
breach of the implied covenant of good faith and fair dealing,
violations of 42 U.S.C. §§ 1983 and 1985, a violation
of HIPPA, breach of contract, and loss of consortium. (Doc.
#13). [1] Klein requests punitive and compensatory damages
totaling $8,000,000.00. *Id.*

On October 13, 2017, Defendants filed the instant motion to
dismiss (Doc. #15), which Klein responded to on November
8, 2017. (Doc. #17). Defendants did not file a reply. At
the conclusion of oral argument on January 22, 2018, in
response to arguments made by Klein, the Court offered him
the opportunity to provide case law to support his contention
that a state university's mere receipt of federal funds acted as
a waiver of its Eleventh Amendment immunity for § 1983
suits. Klein did not file any such brief, though the Defendants
filed a supplemental brief addressing this issue in support of
their motion to dismiss. (Doc. #21).

**\*2** Before analyzing Defendants' arguments, the Court will
briefly describe Klein's allegations against them.

**a. Allegations against the University
of Michigan Board of Regents and the
University of Michigan Medical Center**

The University of Michigan Board of Regents and the
University of Michigan Medical Center are listed in several
claims within Klein's complaint. These defendants are
mentioned under counts for negligent hiring and retention,
failure to provide a safe workplace, breach of the implied
covenant of good faith and fair dealing, a violation of HIPPA,
breach of contract, violations of 42 U.S.C. § 1983 and §
1985, and loss of consortium. (Doc. #13 at 25-31). Despite
being listed under these counts, Klein provides no details
of what these entities allegedly did to warrant liability, and
instead states in a conclusory fashion that they should be held
liable. *Id.*

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)

2018 WL 1614090

### b. Allegations against Harvey

The majority of Klein's allegations relate to his supervisor, Harvey. Klein alleges that starting in 2008, Harvey would "harass, belittle, and mentally torture" him. *Id.* at ¶ 2. This reportedly began at the onset of Klein's employment at the FPD. *Id.* Klein alleges that this first took the form of constant questioning of him about his whereabouts during the workday:

> Harvey was outrageously aggressive and interrogating, and used passive-aggressive and overtly aggressive mannerisms. This act of workplace bullying was health-harming mistreatment of [Klein] with Harvey as perpetrator. It was abusive conduct that is threatening, humiliating, and intimidating, and work interference—sabotage—which prevented work from getting done, and verbal abuse.

*Id.* at ¶ 6. Klein explains that no other employees were questioned about their whereabouts in a similar fashion, and alleges that Harvey treated other FPD employees differently than he did Klein. Specifically, Klein alleges that Harvey "refused to help pursue [Klein's] multiple computer update/ upgrade requests" (*Id* at ¶¶ 49-50), and would "scold" him for being disruptive while talking and laughing too loudly at work, even though other employees "raised a similar disturbance." *Id.* at ¶ 19.

Klein alleges that around August 2013, he met with Harvey for a "negatively-toned" employee evaluation in which Harvey was "egregiously confrontational, and inaccurate, causing Plaintiff great emotional distress, in its use of fear and intimidation. It had no basis in fact, and was health-harming...." *Id.* at ¶ 88. At a later meeting around September 2013, after Klein handed Harvey an "improvement list," Harvey allegedly became "enraged and belligerent." *Id.* at ¶ 99. Harvey allegedly slammed his fist on his desk, which Klein characterizes as an "act of workplace violence." *Id.* Klein further avers that after he was twice given an award from appreciative clients, Harvey never offered congratulations, "as if it never happened." *Id.* at ¶¶

118, 122-123. Last, Harvey is also mentioned in regard to a meeting which took place around February 2014, where Harvey allegedly placed on his Microsoft Outlook calendar, "Dennis' performance improvement review." *Id.* at ¶ 129. As Klein confirmed during oral argument, the contents of the review were never posted, and all that was posted was the mere existence of a meeting. Nevertheless, Klein labels this posting "public humiliation," which allowed those at the University "and some outside agencies" to presume he was a "bad employee," and that "[w]ord was out that [Klein] was now target of Harvey's punitive action." *Id.*

### c. Allegations against Harris

**\*3** Klein lists several allegations against Harris who is a director at the FPD office. *Id.* at ¶ 21. Klein alleges that after he inquired via email about how vendors are paid through the University, Harris called a meeting which "became a hostile-toned interrogation examination of [Klein's] email's intent, implying malfeasance, or dereliction on the part of [Klein] ... this act of workplace bulling was health-harming mistreatment ... it was abusive conduct that was threatening, humiliating, and intimidating, and work interference, and verbal abuse." *Id* at ¶¶ 20, 23. Klein does not detail what specific statements or behaviors led him to describe this meeting in such extreme language. In a later meeting taking place around April 2013, Harris reportedly "confronted [Klein] belligerently, stating that 'he perceived [Klein's] method of executing [a work] project to be inferior and substandard.' " *Id* at ¶ 105. Finally, Klein alleges that after he asked Harris who he should go to when a certain type of work problem arises, Harris grew angry and told him "brusquely" who to seek out in such situations. *Id.* at ¶ 108. Klein alleges this meeting left him so distressed that he could not finish work that day or come in the following day. *Id.* at ¶ 109. Klein asserts that Harris is an "anger-based, fear-instilling terrorizing manager" who has "cronies" who protect him. *Id.* at ¶¶ 149-150.

### d. Allegations against O'Dell

Defendant O'Dell works in the same office as Klein, and apparently serves as Harvey's supervisor. *Id.* at ¶ 109. O'Dell is mentioned to have:

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.212   Filed 02/18/21   Page 8 of 42

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)
2018 WL 1614090

accomplished workplace bullying by: swearing and shouting at [Klein] and other verbal abuse; singling out [Klein] with different policies and standards; ignoring or dismissing [Klein's] work or contributions; offensive conduct or behavior that embarrassed, humiliated, or threatened [Klein], constant targeted criticism or gossip involving [Klein]; and work interference that sabotages [Klein's] work product.

(Doc. #13 at 24). Only one instance of such behavior by O'Dell is set forth in the complaint, where it is alleged that in January 2014, O'Dell "displayed inappropriate disruptive behavior with raised angry voice index finger pointing at [Klein]." *Id.* at ¶ 119. No other information of this alleged incident is provided. The only other mention of O'Dell comes from another employee who reportedly told Klein that O'Dell has always "hated" him and that O'Dell "gets Harvey to enforce this abusive conduct and calculated mode of operation." *Id.* at ¶¶ 131-134.

### e. Allegations against Schlaps, Brussolo, Mello, Siebert, and Quine

The remaining defendants are mentioned scarcely in the complaint. Schlaps is mentioned only once, in regard to an undescribed email that he sent to Klein which apparently included "intentional[ly] fabricated allegations against [Klein], with an intent and effect of being health-harming mistreatment ... it was abusive conduct that was threatening, humiliating, and intimidating, and written abuse by electronic mail." *Id.* at ¶ 142. The details of this email are not disclosed in any capacity. Brussolo works for the in-house IT department, and the allegations against her solely stem from her role in helping replace Klein's work computer, which Klein avers was insufficiently punctual. *Id.* at ¶¶ 36-55. Likewise, Mello is only mentioned for his alleged inability to resolve an IT problem relating to Klein's computer. *See id.* at ¶¶ 56-59. Siebert's actions are not brought into question in this case, with the exception that after Klein sent her an email asking her how vendors are paid, she forwarded Klein's email to Harris. *Id.* at ¶¶ 20-21. Cindy Quine is a Human

Resources representative who is alleged to have "failed/refused to respond to either of [Klein's] calls for help" after Klein expressed frustration over problems at the workplace. *Id.* at ¶ 112. No other details about Quine's role in this claim are presented in the complaint.

### f. Klein's Alleged Injuries

Klein alleges that on April 17, 2014, he suffered a stroke at work while responding to an email he received from Schlaps at 10:30 a.m. *Id.* at ¶¶ 142-143. Klein suggests that he did not seek medical treatment at the onset of his stroke, but "went [to the emergency room] at the end of the workday rather than during the day to avoid Harvey's continued retaliation and harassment." *Id.* at ¶ 144. Though Klein does not bring any claims relating to his post-stroke treatment at the office, he avers that Harvey put pressure on his medical caseworker to force Klein to answer work-related questions from his residence, leading Klein to conclude that his "medical matter was handled inappropriately, in retribution." *Id.* at ¶ 147.

## II. Standard of Review

\*4 A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

In deciding whether a plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the

**Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)**

2018 WL 1614090

complaint as true. *Id*; *see also* *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That tenet, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements. *Iqbal*, 556 U.S. at 678; *see also* *Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 Fed.Appx. 49, 51 (6th Cir. 2009). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers. *See* *Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007). Nonetheless, "[t]he leniency granted to pro se [litigants] ... is not boundless," *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir.2004), and "such complaints still must plead sufficient facts to show a redressable legal wrong has been committed." *Baker v. Salvation Army*, No. 09-11424, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

### III. Analysis

Defendants move to dismiss each of Klein's claims for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). Furthermore, they argue that governmental immunity applies to both the alleged state law tort claims and federal claims. For the reasons discussed below, Defendants' motion to dismiss should be granted.

#### A. State Law Tort Claims

##### 1. Klein Failed to State a Claim as a Matter of Law

###### a. Intentional Infliction of Emotional Distress

In Count 1 of his complaint, Klein asserts an IIED claim against all of the Defendants, but only references conduct by Harvey and O'Dell. After reciting the elements of an IIED claim, Klein states that he sustained injuries "by the direct actions of Defendant Harvey, the direct collusion of Defendant O'Dell, and the conspiratorial participation and collusion of the remaining defendants." (Doc. # 13 at 24). In the ensuing paragraph, Klein alleges:

> Defendants Harvey and Odell accomplished workplace bullying by: swearing and shouting at [Klein] and other verbal abuse; singling out [Klein] with different policies and standards; ignoring or dismissing [Klein's] work or contributions; offensive conduct or behavior that embarrassed, humiliated, or threatened [Klein], constant targeted criticism or gossip involving [Klein]; and work interference that sabotages [Klein's] work product.

**\*5** *Id.*

Under Michigan law, the elements of a claim for IIED are (1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Graham v. Ford*, 237 Mich. App. 670 (1999) (citing *Haverbush v. Powelson*, 217 Mich. App. 228 (1996)). In ruling on such a claim, "it is initially for the [trial] court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Doe v. Mills*, 212 Mich. App. 73 (1995). In order to sustain a claim of IIED, a plaintiff must complain of conduct that meets a particularly high standard:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

of decency, and to be regarded as
atrocious, and utterly intolerable in
a civilized community. Generally, the
case is one in which the recitation
of facts to an average member of
the community would arouse his
resentment against the actor, and lead
him to exclaim, "Outrageous."

*Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980).
Importantly, "[i]nsults, indignities, threats, annoyances, or
petty oppressions are insufficient as a matter of law to be
considered extreme and outrageous conduct." *Graham*, 237
Mich. App. at 675. "The law intervenes only where the
distress inflicted is so severe that no reasonable man could be
expected to endure it." Restatement (Second) of Torts § 46,
cmt. j.

While the non-physical "bullying" conduct alleged against
the Defendants, if true, would be far from laudable, such
behavior does not meet the "extreme and outrageous"
threshold necessary to sustain this claim. As Defendants
correctly point out, courts have found that far more severe
conduct did not constitute the "extreme and outrageous"
conduct required to state an IIED claim. For example, in
*Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1047
(E.D. Mich. 2011), *aff'd*, 504 Fed.Appx. 408 (6th Cir.
2012), the court dismissed an IIED claim brought against
an employer who allegedly chased an employee through the
halls of a hospital while shouting and yelling. *Id.* In *Meek
v. Michigan Bell Tel. Co.*, 193 Mich. App. 340, 342-343
(1991), the court dismissed an IIED claim arising from
workplace bullying that allegedly involved extensive sexual
and religious harassment, in addition to persistent threats of
discipline, insults about the quality of the plaintiff's work,
and slurs relating to her physical stature. Because Klein has
not alleged conduct which reasonably can be characterized as
"extreme and outrageous" under the law, his IIED claim fails
as a matter of law and should be dismissed.

### b. Invasion of Privacy

**\*6** In Count 2 of his complaint, Klein alleges that a "tort of
invasion of privacy" occurred when "Harvey 'announced' to
the Outlook-accessible world that [he] was a 'bad employee'
requiring a 'corrective performance review' on the publicly-

viewable Outlook calendar." (Doc. #13 at 25). While Klein
lists in his complaint four separate theories of an invasion
of privacy claim (*id.*), he does not specify which one he is
proceeding under, though it appears that he is proceeding
under a "false light claim." *See* Restatement Torts, 2d, § 652
E, cmt.b. ("The interest protected by this section is the interest
of the individual in not being made to appear before the public
in an objectionable false light or false position.").

In *Duran v. Detroit News* 200 Mich. App. 622, 631-632
(1993), the court explained that to state a claim for false-light
invasion of privacy a "plaintiff must show that the defendant
broadcast to the public in general, or to a large number
of people, information that was unreasonable and highly
objectionable by attributing to the plaintiff characteristics,
conduct, or beliefs that were false and placed the plaintiff in
a false position." *Id.* Bearing these elements in mind, there
are several problems in regard to Klein's invasion of privacy
claim.

First, any posting of the fact that Klein was scheduled
for a performance review does not rise to the level
of "broadcasting" that courts have previously recognized.
Posting a performance review on a Microsoft Outlook
calendar does not meet the requisite level of broadcasting
because the publication must involve "a communication to
so many persons that the matter is substantially certain to
become public knowledge." *Lansing Ass'n of Sch. Adm'rs
v. Lansing School Dist. Bd. of Educ.*, 216 Mich. App. 79,
89 (citing Restatement Torts, 2d, § 652D, p. 384). While
Klein alleges that his co-workers and "some outside agencies"
may have been able to see this for some short period of
time, courts have held that "small or discrete groups such
as a person's colleagues are not a large enough audience" to
sustain a false light claim. *Geiling v. Wirt Fin. Servs., Inc.*, No.
14-11027, 2014 WL 8473822, at \*48 (E.D. Mich. Dec. 31,
2014), *report and recommendation adopted in part*, No. 14-
CV-11027, 2015 WL 1529866 (E.D. Mich. Mar. 31, 2015),
*aff'd*, No. 15-1393, 2017 WL 6945559 (6th Cir. June 8, 2017)
(citing *Yoder v. Ingersoll–Rand Co.*, 172 F.3d 51, 1998 WL
939885, at \*2 (6th Cir. 1998)).

Further, Klein fails to properly allege that "posting" his
scheduled performance review to an Outlook calendar was
"unreasonable and highly objectionable" or placed him in a
"false position." Given that the alleged posting merely noted
that Klein was subject to a review, Klein has failed to explain
1) how this was unreasonable and highly objectionable, and 2)

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)
2018 WL 1614090

how this placed him in a false position. Klein summarily states in his complaint that the simple posting of his performance review's date and time on Microsoft Outlook leads to the conclusion that he was a "bad employee requiring a corrective performance review." (Doc. #13 at 25). But there is no basis for this presumption other than Klein's own conjecture, which is insufficient to state a claim for relief. *Bredesen*, 500 F.3d at 527. While the simple posting of a performance review to a calendar is in all likelihood not objectionable, it is certainly not "*highly* objectionable." *Duran*, 200 Mich. App. at 631-632 (emphasis added). Performance reviews are a common aspect of employment—often a mandatory one regardless of one's performance or position—and Klein has failed to argue anything otherwise. Likewise, Klein fails to mention any way in which this posting forced him into a false position, rendering his claim without merit. *Fronning v. Jones*, 77 F.3d 482, 1996 WL 82512, at *2 (6th Cir. 1996) (plaintiff must prove a statement was false in order to succeed on a false light claim). For these reasons, Klein's invasion of privacy claim fails as a matter of law.

### c. Negligent Hiring and Retention

**\*7** In Count 3 of his complaint, Klein lists the elements of a negligent hiring and retention claim, and states that "Defendants University of Michigan, the Medical Center, and Defendant Harris, were negligent in their hiring, and retention, of Defendant Harvey and O'Dell." (Doc. #13 at 26). To sustain this type of claim, a plaintiff must identify "the appropriate standard for hiring, retaining, or supervising" the relevant class of employee, *Sanders v. Southwest Airlines Co.*, 86 F. Supp. 2d 739, 746 (E.D. Mich. 2000), as well as allege facts "demonstrating that the employer knew or should have known of the employee's propensity to engage in the challenged conduct." *Isely v. Capuchin Province*, 880 F. Supp. 1138, 1146 (E.D. Mich. 1995).

Here, Klein fails to satisfy the first prong by failing to identify the standard he believes these defendants violated. Indeed, in his reply he merely states that he "can and will point to the University's articulated Employment Policies, after obtaining time-relevant copies of those policies during discovery." (Doc. #17 at 13). At the hearing as well, Klein candidly admitted that he required discovery to even know what to plead. But this simply misapprehends the requirements for overcoming a motion to dismiss; as noted

above, it is the plaintiff's responsibility to plead, *in his complaint*, "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. Conclusory assertions that merely track a claim's elements are insufficient to state a claim. *Iqbal*, 556 U.S. at 678 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim upon which relief can be granted). Therefore, this claim fails as a matter of law and should be dismissed.

### d. Failure to Provide a Safe Workplace

In Count 4 of his complaint, Klein avers that the "University of Michigan, the Medical Center, and Defendant[ ]s Harris and Harvey failed to provide a safe workplace; and the other named defendant[ ]s conspired to make the workplace unsafe by their actions and inactions." (Doc. #13 at 26). As Klein cites in his complaint, under the Michigan Occupational Safety and Health Act, "an employer has a statutorily imposed duty to make the workplace safe for its employees." *Id.* (citing MCL § 408.1001 *et seq.*) This Act requires employers to "[f]urnish to each employee, employment and a place of employment which is free from recognized hazards that are causing, or are likely to cause, death or serious physical harm to the employee." *Id.*

Here, the only "serious physical harm" Klein alleges is the stroke he suffered after reading an email from Schlaps. (Doc. #13 at 26). However, sending an email to a co-worker— particularly one whose contents are not described with any detail—cannot be considered a "recognized hazard" that is likely to cause strokes. If Klein is attempting to indicate that the cumulative stress of workplace bullying and mistreatment led to his stroke—and the email was simply the final straw —his claim would meet a similar fate because there is no authority suggesting that workplace bullying and co-worker disagreements are encompassed by the Michigan Occupational Safety and Health Act. Accordingly, this claim fails as a matter of law.

### e. Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count 5 of his complaint, Klein defines good faith and fair dealing under the Restatement of Contracts, then mentions

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.216 Filed 02/18/21 Page 12 of 42

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)

2018 WL 1614090

that these principles are presumed in all transactions arising under the Uniform Commercial Code. (Doc. # 13 at 27). Klein then asserts that "Defendant University of Michigan, the Medical Center, and Defendant[ ]s Harris and Harvey breached the implied covenant of good faith and fair dealing by failing to follow, or failing to enforce, articulated, facially sufficient policies that would have, if followed, prevented these acts of workplace bullying." *Id.* This claim fails for a number of reasons. As Defendants correctly note, 1) the Uniform Commercial Code does not govern employment contracts such as the one between Klein and the University of

Michigan, *Neibarger v. Universal Coopr., Inc.*, 439 Mich. 512, 534 (1992), and 2) in Michigan, there is no independent tort action for a breach of an implied covenant of good faith

and fair dealing in the employment context. *Ulrich v. Fed. Land Bank of St. Paul*, 192 Mich. App. 194, 197 (1991). (Doc. #15 at 23).

### f. Breach of Contract

**\*8** In Count 8 of his complaint, Klein alleges a breach of contract merely by listing the elements of a breach of contract claim and then stating: "Defendants University of Michigan, the Medical Center, Harris, and Harvey breached the employment arrangement by their actions and inactions." (Doc. #13 at 30). Without specifying what the terms of this employment contract were, how any of the Defendants allegedly breached that contract, or how this resulted in a particular injury, Klein has failed to state a

claim for which relief can be granted. *Twombly*, 550 U.S. at 545 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.") (internal citations omitted).

### g. Loss of Consortium

In Count 9 of his complaint, Klein merely lists the elements of a loss of consortium claim, and states that the Defendants caused this alleged injury. (Doc. #13 at 31). As a result, Klein does not state a claim upon which relief can be granted; "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, a formulaic recitation of a cause of action's

elements will not do[.]" *Twombly*, 550 U.S. at 545 (internal

citations omitted). Moreover, as Defendants correctly assert, "[a] claim of loss of consortium is derivative and recovery is contingent upon the injured spouse's recovery of damages for

the injury." *Berryman v. K Mart Corp.*, 193 Mich. App. 88, 94 (1992) (citing *Moss v. Pacquing*, 183 Mich. App. 574, 583 (1990)). (Doc. #15 at 24). Again, Klein alleges no facts suggesting that a loss of consortium occurred.

### 2. Immunity

Even if any of the foregoing state law tort claims were supported by factual allegations sufficient to overcome Defendants' motion to dismiss, Defendants would still be entitled to a dismissal of those claims based on government immunity. In general, "the governmental immunity act provides broad immunity from tort liability to governmental agencies, officials, or employees who exercise or discharge a governmental function." *Pew v. Michigan State Univ.*, 307 Mich. App. 328, 332 (2014). Therefore, unless Klein's claims fall within a statutory exception to the immunity granted by law, he fails to state a cognizable claim. *Modin v. W. Branch Reg'l Med. Ctr.*, No. 320452, 2015 WL 3478034, at \*3 (Mich. Ct. App. June 2, 2015). There are six statutory exceptions to governmental immunity: 1) the highway exception, MCL § 691.1402; 2) the motor-vehicle exception, MCL § 691.1405; 3) the public-building exception, MCL § 691.1406; 4) the proprietary-function exception, MCL § 691.1413; 5) the governmental-hospital exception, MCL § 691.1407(4); and 6) the sewage-disposal-system-event exception, MCL §§ 691.1417(2) and (3). *See Hannay v. Dep't. of Transp.*, 497 Mich. 45, 60 (2014). Here, the only potentially relevant exceptions are the proprietary-function exception and the governmental-hospital exception.

The proprietary-function exception to governmental immunity holds that immunity does not apply to actions arising out of the performance of a "proprietary function," which is defined as "any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees." MCL § 691.1413. "Therefore, to be a proprietary function, an activity: '(1) must be conducted primarily for the purpose of producing a pecuniary profit; and (2) it cannot be normally supported by taxes and fees.' " *Herman v. Detroit*, 261 Mich. App. 141,

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.217 Filed 02/18/21 Page 13 of 42

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)

2018 WL 1614090

145 (2004) (quoting *Coleman v. Kootsillas*, 456 Mich. 615, 621 (1998)). Klein cannot invoke the proprietary exception to governmental immunity because he fails to plead that the actions giving rise to the suit were "primarily for the purpose of producing a pecuniary profit."

\*9 The governmental-hospital exception to governmental immunity which applies only when suit is brought in connection with the provision of "medical care or treatment" also does not aid Klein. MCL § 691.1407(4). While Klein does name the University of Michigan Medical Center as a defendant, this lawsuit concerns employment matters, not medical care or treatment.

For all of these reasons, Klein cannot avoid the immunity doctrine which protects the Defendants from his state law tort claims.

### B. Federal Claims

#### 1. 42 U.S.C. § 1983 Violation

In Count 6 of his complaint, Klein alleges that "Defendants University of Michigan and the Medical Center deprived [him] of his Constitutional rights of Due Process, derivative rights of Life, Liberty, and the Pursuit of Happiness, and Equal Protection Under the Law." (Doc. #13 at 29). Klein further alleges the same against Defendants Harris and Harvey, and claims these defendants also violated his "First Amendment right to associate and Free Speech." *Id.* In their motion to dismiss, Defendants make two arguments. First, Defendants argue the allegations fail to state a claim upon which relief can be granted. Second, Defendants contend that immunity protects them from these claims. Both arguments have merit.

#### a. Klein Failed to State a Claim as a Matter of Law

First, Klein alleges a violation of his due process rights. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural Due Process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause;

(2) he was deprived of this protected interest; and (3) the State did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Klein does not specify whether this lawsuit concerns deprivation of a property interest or a liberty interest.

If Klein is proceeding under a deprivation of a property interest theory, his claim fails because he did not present any basis in state law that provides an entitlement to benefits that he was denied without due process. *Id.* (quoting *Bd of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Property interests protected by the due process clause must be more than abstract desires or attractions to a benefit. The Due Process Clause only protects those interests to which one has a legitimate claim of entitlement." *Brotherton v. Cleveland*, 923 F.2d 477, 480 (6th Cir. 1991) (citations and internal quotation marks omitted). To succeed on a due process claim in the public employment context, a plaintiff must establish: (1) that he had a property interest/right in his employment, and (2) that the public employer's termination of that interest was arbitrary or capricious." *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993).

The existence of a property interest depends largely on state law. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Government employment amounts to a protected property interest when the employee is "entitled" to continued employment, but neither mere government employment nor an abstract need or desire for continued employment will give rise to such an interest. *Id.* at 577; *Gregory v. Hunt*, 24 F.3d 781, 787 n. 4 (6th Cir. 1994). Rather, a property interest exists and its boundaries are defined by "rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Accordingly, to establish a protected interest in his position at the University of Michigan, Klein was required to point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment. Klein makes no averment to the existence of such a property interest, but even if one assumes *arguendo* that he does possess such an interest in his employment, his claim fails because he never alleges that that interest was terminated.

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.218 Filed 02/18/21 Page 14 of 42

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)

2018 WL 1614090

**\*10** If Klein is proceeding under a deprivation of liberty interest theory, it is presumably based on the meeting he had with Harvey that was posted on Microsoft Outlook. As with the deprivation of property interest claim, this claim lacks merit. The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in his "reputation, good name, honor, and integrity." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). That liberty interest is violated when a state actor "stigmatize[s]" an individual by means of "voluntary, public dissemination of false information" about the individual. *Id.* at 320 (internal quotation marks omitted). In order to invoke this constitutional protection, a plaintiff must establish that his injury is tied to "[s]ome alteration of a right or status 'previously recognized by state law.'" *Quinn*, 293 F.3d at 319. In the context of public employment, as is the case here, the Sixth Circuit has outlined a 5-part test that a plaintiff must establish in order to prove a due process violation with respect to this interest:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment.... Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.... Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Crosby v. Univ. of Kentucky*, 863 F.3d 545, 555 (6th Cir. 2017). At a minimum, Klein did not allege that 1) he was terminated, or 2) that any stigmatizing statements were made public. Accordingly, he has not stated a viable deprivation of liberty interest claim and his due process claim fails as a matter of law.

Second, Klein appears to try to assert an equal protection claim, despite offering no explanation of what specific events give rise to this claim. The Fourteenth Amendment generally demands "that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause itself requires that no State may "deny to any person within its jurisdiction the Equal Protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4.

In the public employment context, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Disparate-treatment cases present "the most easily understood type of discrimination," *Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977), and occur where an employer has "treated [a] particular person less favorably than others because of" a protected trait. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–986 (1988). A disparate-treatment plaintiff must therefore establish "that the defendant had a discriminatory intent or motive" for taking a job-related action. *Id.* at 986.

Here, Klein does not suggest that he is a part of a protected class, nor does he make any allegation that the way he was treated was the result of discriminatory intent or motive. The only allegations bearing any semblance to unfavorable treatment relates to his work computer allegedly not being fixed as quickly as he desired (Doc. #13 at ¶ 82) ("Plaintiff was being treated differently from other employees with respect to his work equipment"), and being "scolded" by Harvey for being disruptive during the workday. (*Id.* at ¶ 19) ("Although [other employees] raised a similar disturbance in the hallway [another employee] and Plaintiff noticed Harvey would not likewise scold them, rather, often join in their disturbance as well. This demonstrates disparate treatment, without cause."). Klein fails to allege how this allegedly unfavorable treatment was due to class-based discriminatory intent, and additionally fails to demonstrate that he is a member of a protected class. Accordingly, Klein's equal protection claim lacks merit.

**\*11** Third, Klein asserts a violation of his First Amendment rights. (Doc. #13 at 29). In particular, he alleges violations of his freedom of speech, as well as his right of association. *Id.* In order to establish that Defendants violated Klein's First Amendment right to free speech, Klein must demonstrate that

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.219 Filed 02/18/21 Page 15 of 42

Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)
2018 WL 1614090

"1) he was disciplined for speech that was directed toward an issue of public concern, and 2) that his interest in speaking as he did outweighed the [public employer's] interest in regulating his speech." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Connick v. Myers*, 461 U.S. 138, 147-50 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Klein failed to allege that he was ever disciplined for speech that was directed toward an issue of public concern. As it pertains to the violation of his First Amendment right to associate, Klein was required to allege that he was in fact prevented from sharing his beliefs and ideas with others. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). Here, as explained earlier, the only time Klein's speech was addressed was when he was merely told to "quiet down" while being disruptive. (Doc. #13 at ¶ 19). Indeed, as he alleges in his brief, he was singled out not for advancing or discussing any particular belief or idea, but rather for being too loud. *Id.* Klein was never precluded from *associating*—he was asked to engage in workplace discussions in a work-appropriate tone. Accordingly, this claim fails as a matter of law.

#### b. Immunity

Klein's § 1983 claims against Defendants in their official capacities also fail as a matter of law. The doctrine of sovereign immunity is granted by the Eleventh Amendment to the Constitution and bars § 1983 claims for money damages brought against a state or its employees in their official capacity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984). Under the Eleventh Amendment, a state can only be held liable in federal court suits (1) if Congress has expressly abrogated immunity by statute, or (2) if the state waives immunity. *Id.*; *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

Here, the University of Michigan clearly falls under the definition of the state for purposes of immunity. *Vargo v. Sauer*, 457 Mich. 49, 71 n.24, 576 N.W.2d 656, 666 (1998) ("[A]s an extension of the state, generally [a state university]

is entitled to invoke sovereign immunity."); *Ewing v. Bd. of Regents of the Univ. of Michigan*, 552 F. Supp. 881, 883 (E.D. Mich. 1982) ("[T]he University is a state instrumentality entitled to Eleventh Amendment immunity."). Likewise, a suit brought against the University of Michigan's employees acting in their official capacities is treated as a suit against the State, thus affording parallel protection. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity ... should be treated as suits against the State."). Therefore, Klein would have to meet one of the two qualifications to the sovereign immunity doctrine in order to sustain his official capacity claims against the Defendants. This, however, he cannot do.

First, Congress did not abrogate state sovereign immunity for § 1983 lawsuits. As Defendants correctly note, the Supreme Court has held that "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity...." (Doc. #15 at 10) (citing *Will*, 491 U.S. at 66). Nor, contrary to Klein's assertion, did the University of Michigan waive its immunity to § 1983 suits merely "[b]ecause [it] has accepted a nearly innumerable amount of federal funding under multiple programs ..." (Doc. #17 at 9). First, courts "will give effect to a State's waiver of Eleventh Amendment immunity *only* where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990) (emphasis added). Second, the law is clear that the "mere receipt of federal funds does not indicate that a state has consented to suit in federal court." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 926 (1985); *Cardinal v. Metrish*, 564 F.3d 794 (6th Cir. 2009) ("general participation in a federal program or the receipt of federal funds is insufficient to waive sovereign immunity") (citing *Atascadero*, 473 U.S. at 246-247). Here, whereas Klein failed to cite any authority suggesting that the University ever agreed—by way of express or even implied terms—to waive its immunity to § 1983 suits in return for its receipt of federal funds, Defendants cited numerous cases holding that a state University's mere receipt of federal funds does not waive Eleventh Amendment immunity for § 1983 claims. (Doc. #21) (citing *Goonewardena v. New York*, 475 F. Supp.2d 310 (S.D.N.Y., 2007) ("[w]hile the acceptance of federal funds by a state entity waives that state's immunity for

purposes of Title VI, it does not for purposes of section 1983.")); *See also Cummings v. New York State Mental Health*, No. 1:11-CV-0892 LEK/DRH, 2013 WL 4805748, at *3 (N.D.N.Y. Sept. 9, 2013).

**\*12** For all of these reasons, Klein's § 1983 claims against Defendants in their official capacities lack merit and should be dismissed.

### 2. Conspiracy Claim under 42 U.S.C. § 1985

In Count 6 of his complaint, Klein alleges that Schlaps, Brussolo, Seibert, Mello, and Quine "deprived [him of his] Constitutional rights of Due Process, derivative rights of Life, Liberty, and the Pursuit of Happiness, and Equal Protection Under the law, by conspiring with O'Dell and Harvey" in violation of (presumably) 42 U.S.C. § 1985(3), which is titled "Depriving Persons of Rights or Privileges." (Doc. #13 at 29). This claim fails as a matter of law.

To succeed on a claim brought pursuant to 42 U.S.C. § 1985(3), "a plaintiff must prove (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States." *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Additionally, the plaintiff must allege that "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999); *see also Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 765 (6th Cir. 2010) ("To sustain a claim under section 1985(3), a claimant must prove both membership

in a protected class and discrimination on account of it."). Here, Klein merely complains about the manner in which certain of the Defendants treated him in connection with his job performance (as opposed to a deprivation of equal protection), and makes no claim that race or other class-based factors played a role in the challenged conduct.

Moreover, conspiracy claims must be pled with specificity —conclusory allegations are insufficient. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Twombly*, 550 U.S. at 556. Klein's § 1985 claim fails to meet this pleading standard as he avers nothing beyond conclusory allegations that certain of the Defendants "conspired" with others. (Doc. #13 at 29, ¶ 6).

### 3. HIPPA Violation

In Count 7 of his complaint, Klein alleges a HIPPA violation. (Doc. #13 at 29). In addition to the fact that Klein recognizes that HIPAA does not confer a private right of action (Doc. # 17 at 9), Klein's complaint does not allege any facts whatsoever suggesting that a HIPAA violation took place. That is, Klein, does not allege being a patient, or that any information relating to his "past, present, or future physical or mental health or condition" was ever disclosed. 45 C.F.R. § 160.103. Accordingly, his HIPPA claim should be dismissed.

### IV. Conclusion

**\*13** For the reasons stated above, **IT IS RECOMMENDED** that Defendants' motion to dismiss **(Doc. #15)** be **GRANTED** and that Klein's complaint be **DISMISSED**.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1614090

---

### Footnotes

1    This second amended complaint represents Klein's third bite at the apple. He filed his initial complaint on April 17, 2017, and then an amended complaint on July 31, 2017, which did not assert any new claims or requests for relief. (Docs. #1, #4). Defendants filed a motion to dismiss on August 14, 2017. (Doc. #7). On September 6, 2017, Klein filed an "Answer in Opposition [to] Defendant's Motion to Dismiss and Motion Seeking Leave

**Klein v. University of Michigan, Board of Regents, Not Reported in Fed. Supp. (2018)**

2018 WL 1614090

to Amend Complaint." (Doc. #9). The Court granted this motion, and on September 29, 2017, Klein filed his second amended complaint that is the subject of Defendants' instant motion. (Doc. #13).

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

2011 WL 13124122
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Linda MARTINSON, Plaintiff,

v.

REGENTS OF THE UNIVERSITY OF MICHIGAN,
a constitutional body corporate; Carol Loveland-
cherry, individually and in her official capacity;
Judith Lynchsauer, individually and in her official
capacity; and Bonnie Hagerty, individually
and in her official capacity, Defendants.

Case No. 09-13552
|
Signed 09/28/2011

**Attorneys and Law Firms**

Linda Martinson, Troy, MI, pro se.

Jennifer L. Newby, U.S. Attorney, Timothy H. Howlett,
Dickinson Wright, Detroit, MI, for Defendants.

OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION
TO DISMISS (DKT. NO. 33) AND ORDERING
PLAINTIFF TO FILE HER RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON OR BEFORE OCTOBER 21, 2011

PAUL D. BORMAN, UNITED STATES DISTRICT JUDGE

*1  This matter is before the Court on Defendants' motion
to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P.
12(b)(6) and 12(b)(1). (Dkt. No. 33.) Plaintiff filed a response.
(Dkt. No. 40.) Defendants filed a reply. (Dkt. No. 41.) The
Court held a hearing on August 31, 2011. For the reasons that
follow, the Court GRANTS IN PART and DENIES IN PART
Defendants' motion to dismiss.

**INTRODUCTION**

Plaintiff claims that she was denied both substantive and
procedural due process in violation of the United States and
Michigan Constitutions in her expulsion from the University
of Michigan Nursing Program. Plaintiff seeks declaratory and

equitable relief, as well as money damages, pursuant to 42
U.S.C. § 1983 for her federal claims and pursuant to the
Michigan Constitution for her state claims. Defendants now
move to dismiss Plaintiff's Complaint, arguing that certain
of Plaintiff's claims are barred by Eleventh Amendment and/
or Qualified Immunity and that the remainder of Plaintiff's
claims fail to state a claim under Fed. R. Civ. P. 12(b)(6).

For the reasons that follow, the Court GRANTS Defendants'
motion to dismiss all of Plaintiff's claims against the
University Board of Regents and GRANTS Defendants'
motion to dismiss Plaintiff's § 1983 claims for
monetary and other retrospective relief against the individual
Defendants in their official capacities. The Court GRANTS
Defendants' motion to dismiss Plaintiff's Federal and State
substantive due process claims. The Court GRANTS
Defendants' motion to dismiss Plaintiff's state law procedural
due process claims and GRANTS Defendants' motion to
dismiss Plaintiff's *respondeat superior* claim. The Court
DENIES Defendants' motion to dismiss Plaintiff's procedural
due process claim against the individual Defendants in their
individual capacities.

**I. BACKGROUND**

Plaintiff was a student at the University of Michigan
Nursing School from August, 2007 through her expulsion
in November, 2007. (Compl. ¶10.) In September, 2007,
Plaintiff began to have clinical performance problems in
one of her nursing classes. A variety of factors contributed
to these admitted performance problems, including the fact
that Plaintiff's daughter had recently received an unexpected
medical diagnosis. (*Id.* ¶¶ 13-14.) On September 17, 2007,
Plaintiff approached her clinical instructor of the class in
which she was having problems, Diane Bohn, who advised
her to leave the program because the workload and stress
level were only going to increase. (*Id.* ¶ 15.) From this point
on, Plaintiff perceived that her relationship with Ms. Bohn
deteriorated rapidly, as Ms. Bohn began to document alleged
problems with Plaintiff's clinical performance. Ms. Bohn
involved some of the Defendants in meetings with Plaintiff,
during which Plaintiff's performance was criticized, criticism
to which Plaintiff "was not receptive." (*Id.* ¶¶ 16-18.) It
was Plaintiff's belief that after one such meeting on October
12, 2007, Defendants Lynch-Sauer and Hagerty developed a
"strong, personal dislike for Plaintiff, wanted to expel her, and
were looking for justification for the same." (*Id.* ¶ 18.)

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

**\*2** Plaintiff alleges that on or about October 16, 2007, Defendant Bohn filed a report with Defendant Loveland-Cherry detailing a supposed honor code violation by Plaintiff. Plaintiff was asked to attend a meeting on October 17, 2007 with Defendants Hagerty and Loveland-Cherry to discuss the report, at which further criticism of Plaintiff was offered "to which Plaintiff was unresponsive." At the meeting, Loveland-Cherry also informed Plaintiff that there had been reports by other students that Plaintiff had violated the student honor code, but the individuals were not identified by name. Defendant Loveland-Cherry had requested that the University of Michigan Department of Public Safety (DPS) be present at the meeting and, at Loveland-Cherry's request after the meeting, the DPS issued Plaintiff a no-trespass citation barring her from entering the campus. (*Id.* ¶¶ 19-21.)

Following this meeting, Loveland-Cherry submitted a request to the Vice-President of Student Affairs asking that Plaintiff be removed from the School of Nursing based on several reported incidents of Plaintiff's disrupting the educational environment and causing faculty and students to feel threatened and intimidated. Plaintiff alleges that the claimed incidents were overblown and that Plaintiff never threatened anyone with bodily harm. (*Id.* ¶¶ 23-25.) Loveland-Cherry's request was transferred to the Office of Student Conflict Resolution which issued a memorandum on October 22, 2007, indicating that Plaintiff posed no immediate threat to safety and recommended further monitoring of Plaintiff's behavior and referral for counseling. (*Id.* ¶¶ 26-28.)

Loveland-Cherry continued to pursue the matter and on October 22, 2007, scheduled a "preliminary inquiry hearing" for November 5, 2007, the week of Plaintiff's final exams, regarding Bohn's report of honor code violations. The preliminary inquiry hearing was held on November 5, 2007, as scheduled and noticed, but Plaintiff was "unable to attend." (*Id.* ¶¶ 29-32.) On November 7, 2007, pursuant to guidelines in the University of Michigan Handbook, Loveland-Cherry advised in a memorandum that the complaint against Plaintiff, based on behavior with clinical staff, faculty and student peers that was not consistent with the American Nursing Association Code of Ethics, would proceed to the next hearing level – before the Committee on Academic Admissions and Scholastic Standing ("CAASS") Hearing Panel. (*Id.* ¶¶31, 35-38.) The memorandum requested that the hearing be scheduled on an expedited basis, and the Final Hearing was scheduled for November 9, 2007.

On November 7, 2007, Loveland-Cherry approached Plaintiff and attempted to hand her a packet regarding the scheduled hearing. Plaintiff refused to accept the packet because she "was scared" and was afraid she "was going to be arrested." (*Id.* ¶¶ 39-41.) At 1:48 p.m. on that afternoon, Loveland-Cherry sent Plaintiff an email with the packet material attached, but Plaintiff never opened the attachment. Plaintiff did not attend the November 9, 2007 Final CAASS hearing. The evidence presented before the CAASS panel contained numerous written statements by Plaintiff's peers regarding incidents where Plaintiff allegedly intimidated, threatened or frightened them. (*Id.* ¶¶ 42-46.)

At the Final CAASS Hearing on November 9, 2007, Bohn suggested that Plaintiff not be expelled but be strictly monitored until she addressed some personal issues. Lynch-Sauer and Hagerty recommended expulsion, which the CAASS Committee approved, effective November 16, 2007, immediately and permanently expelling Plaintiff from the School of Nursing.

Plaintiff filed an internal administrative appeal pursuant to University of Michigan internal policies. The appeal panel found that Plaintiff had been given an inadequate amount of time to respond to the charges against her and that less drastic sanctions should have been considered. The panel recommended that a new CAASS hearing panel be convened. (*Id.* ¶¶ 49-56.) The School of Nursing declined to follow the appeal panel's recommendations and advised Plaintiff in writing on August 28, 2008 that she was permanently expelled. (*Id.* ¶ 57.) This lawsuit followed.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(6)

**\*3** Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Direct TV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.224 Filed 02/18/21 Page 20 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

**B. Federal Rule of Civil Procedure 12(b)(1)**

*4 Where federal subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction exists. *Michigan SRR Co. v. Branch & St. Joseph Counties Rail Users Ass'n Inc.*, 287 F.3d 568, 573 (6th Cir. 2002); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996) ("When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.") "The court has wide discretion to consider materials outside the complaint in assessing the validity of its jurisdiction." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

**III. ANALYSIS**

**A. Plaintiff's 42 U.S.C. § 1983 Claims Against the Board of Regents, and the Claims Against the Individual Defendants in Their Official Capacities for Damages or Other Retrospective Relief, Are Dismissed Based on Eleventh Amendment Immunity; Also Dismissed Is Plaintiff's Vicarious Liability Claim Against the University**

It is well established that states, state entities and state officials sued in their official capacities for damages or other retrospective relief are not "persons" subject to liability under 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself."). The University of Michigan Board of Regents (hereinafter "the University" or "the Board") has long been

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.225 Filed 02/18/21 Page 21 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

considered an arm of the state for purposes of Eleventh Amendment immunity. ④*Estate of Ritter v. University of Michigan, et al.*, 851 F.2d 846, 851 (6th Cir. 1988) (concluding that the University of Michigan Board of Regents is unquestionably a state agency to which the Eleventh Amendment applies absent a waiver of that immunity. *See also Platt v. University of Michigan, et al.*, No. 09-cv-10886, 2010 WL 1286487, at *10 (E.D. Mich. March 3, 2010) (holding that the University of Michigan and the individual defendant university officials and supervisors were entitled to Eleventh Amendment immunity and dismissing plaintiff's ADEA and ADA claims against them for monetary damages); *Sullivan v. Regents of the University of Michigan*, No. 08-12245, 2009 WL 2915787, at *6 (E.D. Mich. Sept. 8, 2009) (holding that the Eleventh Amendment bars suit against a University of Michigan police officer in his official capacity, citing *Ritter*); Picozzi v. Sandalow, 623 F. Supp. 1571, 1573 n. 1 (E.D. Mich. 1986) (dismissing Board of Regents and individual defendants in their official capacities based on Eleventh Amendment Immunity); *Ewing v. Bd. of Regents of the Univ. of Michigan*, 552 F. Supp. 881, 883 (E.D. Mich. 1982) (holding that, absent waiver, the University of Michigan is a state instrumentality entitled to Eleventh Amendment immunity).

Similarly, all state law claims against the University and the individual Defendants in their official capacities are barred by the Eleventh Amendment in an action brought in federal court. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984) ("We concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. We now hold that this principle applies as well to state-law claims brought into federal court under pendent jurisdiction."). *See also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520-21 (6th Cir. 2007) (citing *Pennhurst*, *supra*) ("The Supreme Court has squarely held that pendent state law claims against state officials in their official capacity are barred by the Eleventh Amendment."); *Sullivan*, 2009 WL 2915787, at *6 (holding that the Eleventh Amendment also barred plaintiff's pendent state law claims against the university police officer in his official capacity) (citing *Experimental Holdings, supra*)[1]

**\*5** This dismissal of Plaintiff's state law claims applies to all forms of relief sought, including prospective injunctive relief, which may be available to Plaintiff in federal court

on her federal claims against the individual Defendants in their official capacities under the doctrine of *Ex Parte Young*. The Supreme Court clearly embraced this conclusion in *Pennhurst*:

> This need to reconcile competing interests [recognized in *Ex Parte Young*] is wholly absent, however, when a plaintiff alleges that a state official has violated state law. In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Pennhurst*, 465 U.S. at 106 (internal quotation marks and citations omitted). *See also United States Pipe & Foundry Co. v. Johnson*, 927 F.2d 296, 298-99 (6th Cir. 1991) (recognizing that "[t]he Supreme Court has held that the eleventh amendment prohibits federal courts from ordering state officials to conform their conduct to state law") (citing *Pennhurst*, *supra*).

Plaintiff does not address Defendants' Eleventh Amendment immunity argument in her response and continues to assert that, as a government entity, the University can be held "vicariously responsible" for "their employees constitutional torts, under Monell v. Department of Social Services*, 436 U.S. 658 (1978)." As discussed above, the University is absolutely immune from liability for monetary damages or other retrospective relief and *Monell* provides no exception to this immunity. "[I]t does not follow that if municipalities

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.226   Filed 02/18/21   Page 22 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

are persons then so are States. States are protected by the Eleventh Amendment while municipalities are not, and we consequently limited our holding in *Monell* 'to local government units which are not considered part of the State for Eleventh Amendment purposes ....' " *Will*, 491 U.S. at 70 (quoting *Monell*, 436 U.S. at 690 n. 54.) Moreover, Plaintiff misperceives the basis of *Monell* liability, which, even when directed at a nonimmune governmental entity, cannot be premised on a theory of vicarious liability. *Monell*, 436 U.S. at 691-695. A municipality cannot be held liable pursuant 42 U.S.C. § 1983 on a theory of *respondeat superior.* *Monell*, 436 U.S. at 691-95; *Phillips v. Roane County Tenn* , 534 F.3d 531, 543 (6th Cir. 2008) (holding that § 1983 liability must be based on more than respondeat superior, or the right to control employees) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Plaintiff's vicarious liability claim (Count VI) is dismissed in its entirety.

Accordingly, the Court GRANTS Defendants' motion to dismiss all of Plaintiff's claims against the University Board of Regents. The Court further GRANTS Defendants' motion to dismiss Plaintiff's state law claims, as well as Plaintiff's claims for retrospective or monetary relief under 42 U.S.C. § 1983, against the individual Defendants in their official capacities. The Court also GRANTS Defendants' motion to dismiss Plaintiff's vicarious liability claim (Count VI).

**B. Plaintiff's 42 U.S.C. § 1983 Substantive Due Process Claim**

**\*6** Plaintiff claims that as "a student at a public university, Plaintiff had a constitutionally protected fundamental right and interest in continuing her education at The University of Michigan School of Nursing." (Compl. ¶ 60.) She further claims that she had "a constitutionally protected property interest in continuing her education at the University of Michigan School of Nursing." (Compl. ¶ 61.) She claims that her expulsion from the School of Nursing was "arbitrary and capricious," was "motivated by bad faith," and "shocks the conscience." (Compl. ¶¶ 63, 66.) These allegations form the basis for Plaintiff's substantive due process claims.

While the waters remain murky on the issue of whether continued enrollment at a public university is a fundamental interest (either property or liberty) protected by substantive due process, the better reasoned view is that it is not and that, even if it is assumed to be, the "avenue of judicial review" of academic decisions claimed to interfere with such a right is extremely "narrow." While sidestepping on more than one occasion the ultimate issue of the true "fundamental" nature of any such right, the Supreme Court has clearly held that such academic decisions will survive any assumed substantive constitutional challenge unless they are manifestly "irrational" and unrelated to any legitimate educational goal, representing "a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment." *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 227, 228 n. 13 (1985) (noting that the Court had assumed, without deciding, in *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91-92 (1978), that federal courts can review academic decisions of a public educational institution under a substantive due process standard, and once again proceeding on that "assumption" in the case before it).

Thus, while the Supreme Court has not expressly held that the right to a continued public university education is a fundamental right protected by substantive due process, it has often enough made such an assumption without deciding otherwise so that there is no clear directive, leading to several inconsistent decisions in this and other circuits. Often prominent in the debate is Justice Powell's impassioned and oft-quoted concurring opinion in *Ewing*, in which he agreed with the Court's ultimate conclusion that Ewing presented "no violation of the substantive due process right that he asserts," but disagreed with the Court's "assumption" that such a right could exist:

> Although I join the Court's opinion holding that respondent presents no violation of the substantive due process right that he asserts, I think it unnecessary to assume the existence of such a right on the facts of this case. Respondent alleges that he had a property interest in his continued enrollment in the University's Inteflex program, and that his dismissal was arbitrary and capricious. The dismissal allegedly violated his substantive due process rights guaranteed by the

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.227 Filed 02/18/21 Page 23 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

Fourteenth Amendment, providing the basis for his claim under 42 U.S.C. § 1983.

* * *

The interest asserted by respondent —an interest in continued enrollment from which he derives a right to retake the NBME—is essentially a state-law contract right. It bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution. For these reasons, briefly summarized, I do not think the fact that Michigan may have labeled this interest "property" entitles it to join those other, far more important interests that have heretofore been accorded the protection of substantive due process.... Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed—as in this case.

*7 474 U.S. at 228-30 (internal quotation marks and citations omitted). Although there is much intuitive appeal in Justice Powell's concurrence, the wiser course under the present state of the law is to continue to "assume" such a right can be asserted under rare circumstances and to restrict the scope of judicial review of such decisions to the most narrow constitutionally permissible and deferential standard.

In analyzing this issue, the concepts of equal protection and substantive due process, although distinct, necessarily begin to merge at some point in the dialectic. The Supreme Court's conclusion, expressed in *Ewing*, that even assuming the existence of a fundamental right in this educational context, academic decisions impacting such a right will survive a substantive constitutional challenge unless found to be "irrational" and "unrelated to legitimate governmental objectives," terms we typically associate with an equal protection and not a due process analysis, bears this out. This intersecting of the two doctrines was clearly explained by the Sixth Circuit in *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988):

While the concepts of equal protection and substantive due process are defined differently, they are, in actuality, very similar concepts. Both stem from our American ideals of fundamental fairness and both enmesh the judiciary in substantive review of governmental action. The spheres of protection offered by the two concepts are not, to be sure, coterminous. However, they will overlap in certain situations so that a violation of one will constitute a violation of the other.... The equal protection clause of the fourteenth amendment requires the government to treat similarly situated individuals in a similar manner.... Substantive due process, a much more ephemeral concept, protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action. The fundamental rights protected by substantive due process arise from the Constitution itself and have been defined as those rights which are implicit in the concept of ordered liberty. While this is admittedly a somewhat vague definition, it is generally held that an interest in liberty or property must be impaired before the protections of substantive due process become available. Even if such an interest has been impaired by governmental action, courts will review the challenged decision only for arbitrariness or capriciousness. Indeed, in the academic setting, as the Supreme Court made clear in *Ewing*, courts may override a decision under

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.228 Filed 02/18/21 Page 24 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

substantive due process only if that decision is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

860 F.2d at 1328-29 (internal quotation marks and citations omitted).

Based on this reasoning, the Sixth Circuit in *Bell v. Ohio State Univ.*, 351 F.3d 240 (6th Cir. 1985), expressly relying in part on *Gutzwiller*, held that substantive due process does not protect a medical student's interest in continuing education, absent evidence of an equal protection violation:

The interests protected by substantive due process are of course much narrower than those protected by procedural due process. Most property interests warranting the protection of procedural due process, for instance, may be substantively modified or abolished by the legislature. Interests protected by substantive due process, which the legislature may not infringe unless supported by sufficiently important state interests, include those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that "shock the conscience," and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental.

*8 351 F.3d at 249-50 (internal citations and quotation marks omitted). In *Bell*, the court noted that none of the cases cited by plaintiff had actually found that such an interest exists, each case (including *Ewing* and *Horowitz*) having assumed such an interest *arguendo* and with great reluctance based on concerns of federalism and academic freedom. The court concluded: "Where ... there is no equal protection violation, we can see no basis for finding that a

medical student's interest in continuing her medical education is protected by substantive due process." *Id.* at 251, 251 n.2.

Such a conclusion comports with the Supreme Court's holding in *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973) that the right to a public education is not a fundamental right, and that government action that denied access to public education did not merit strict scrutiny analysis in an equal protection context and need only be rationally related to a legitimate governmental interest:

The lesson of these cases in addressing the question now before the Court is plain. It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution.... Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected. As we have said, the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation.

411 U.S. at 34-35. *See also* *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (relying in part on *San Antonio Independent Schools*, rejecting the argument that suspension of a high school student implicated a fundamental right and concluding that "[i]n the context of school discipline, a substantive due process claim will succeed only in the

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.229   Filed 02/18/21   Page 25 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

rare case when there is no rational relationship between the punishment and the offense.") (internal quotation marks and citations omitted). See also [image] Hill v. Bd. of Trustees of Mich. State Univ., 182 F. Supp. 2d 621, 626-27 (W.D. Mich. 2001) (citing Seal for the proposition that the right to attend public high school is not a fundamental right protected by due process and noting that the right to a public higher education is even less deserving of such protection).

In analyzing this issue, courts have arrived at similar conclusions, albeit via different analytical paths. Cf. [image] Ku v. State of Tennessee, 322 F.3d 431, 435 (6th Cir. 2003) (analyzing a substantive due process challenge to a public school expulsion, without discussion of the underlying debate over whether such a claim can be stated, citing Ewing and Horowitz, and finding not "a shred of evidence that the College's actions constitute a substantial departure from accepted academic norms or were otherwise taken in bad faith," finding the decision neither arbitrary nor capricious and entering judgment as a matter of law in favor of the school); [image] Lee v. University of Michigan-Dearborn, No. 06-cv-66, 2007 WL 2827828, at *5 (W.D. Mich. Sept. 27, 2007) (holding that plaintiff's expulsion did not implicate substantive due process protections because "a student's right to attend a public high school is not a fundamental right for purposes of substantive due process analysis" and concluding that "a post-secondary student such as plaintiff has even a lesser claim that her attendance at a college or university is a fundamental right"); [image] Rogers v. Tennessee Board of Regents, 273 Fed.Appx. 458, 463 (6th Cir. 2008) (finding that plaintiff's interest in her nursing education was not protected by substantive due process, relying on Bell, which "rejected the notion that substantive due process protects a medical student's interest in continuing education."); [image] McGee v. Schoolcraft Community College, 167 Fed.Appx. 429, 436-37 (6th Cir. 2006) (relying on Bell and refusing, in the absence of an alleged equal protection violation, to find a substantive due process right to continued enrollment based on plaintiff's dismissal for poor performance and inappropriate behavior with patients); Zwick v. Regents of University of Michigan, No. 06-12639, 2008 WL 1902031, at *6 (E.D. Mich. April 28, 2008) (declining to analyze the substantive due process claim as "unnecessary" based on the court's finding that plaintiff had a protected property interest in her continued university enrollment and concluding, on a procedural due process analysis, that plaintiff had demonstrated a material issue of fact as to whether she received sufficient notice).

*9 Based on Bell, McGee and Rogers, Defendants argue that neither Plaintiff's interest in her enrollment in the School of Nursing (property) nor her interest in her reputation (liberty) are fundamental interests protected by substantive due process. (Defs.' Mot. 3-4.) While the Court has doubts, similar to those expressed in Justice Powell's concurrence in Ewing, as to whether such interests should ever be protected by substantive due process, the better course based on the current law is to assume arguendo that such a claim can be stated and to analyze the facts accordingly.

In the instant case, Plaintiff has not pleaded facts which would indicate conduct on the part of the Defendants that "shocks the conscience" or that amounts to "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." First, Plaintiff has not asserted an equal protection violation and the inquiry could end there. See Bell and McGee supra. Even were the Court to analyze the facts further, it is undisputed that Plaintiff was academically struggling to keep up with her assignments. (Compl. ¶¶ 13-14.) It is also undisputed that multiple students complained to the School of Nursing, in written statements, about various incidents involving Plaintiff's alleged threatening behavior. (Compl. ¶¶ 44-46.) Far from being "arbitrary and capricious," or "irrational," the Defendants' actions in addressing both Plaintiff's poor academic performance and her fellow students' complaints were clearly related to the university's interests in protecting both the quality of the educational program and the safety and well-being of the students. "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." [image] Ewing, 474 U.S. at 225.[2]

Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiff's substantive due process claims (Counts I and III).

### C. Plaintiff's Procedural Due Process Claim

Plaintiff claims that she was not given constitutionally sufficient notice and an opportunity to be heard before her expulsion for alleged violations of the nursing school code of ethics. In [image] Flaim v. Medical College of Ohio, 418 F.3d 629, 633 (6th Cir. 2005), the Sixth Circuit stated: "In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions." Like

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.230   Filed 02/18/21   Page 26 of 42

**Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)**

2011 WL 13124122

Plaintiff, Michael Flaim was a graduate student at a public university, a third-year medical student attending the Medical College of Ohio. Flaim was arrested and convicted of a felony drug charge and ultimately expelled from the college, after a limited hearing and no right to appeal, for violating "institutional standards of conduct." 418 F.3d at 633. The Sixth Circuit began its discussion of Flaim's procedural due process claim, which the district court had dismissed for failure to state a claim, by noting the established proposition that higher education disciplinary decisions implicate the safeguards of procedural due process. *Id.* In fact, the *Flaim* case was about *what* process Flaim was due, and not at all about *whether* any process was due, which was presumed based on existing law:

> **\*10** In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions. *Jaksa v. Regents of Univ. of Mich*, 597 F.Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986) (finding due process clause implicated in suspension from university for cheating); *see also Goss v. Lopez*, 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (liberty and property interest implicated in high-school suspension); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (a student's interest "in pursuing an education is included within the fourteenth amendment's protection of liberty and property"). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The amount of process due will vary according to the facts of each case and is evaluated largely within the framework laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). See also *Gorman*, 837 F.2d at 12 (stating that due process is "not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation"). Because Flaim's case is a disciplinary expulsion, rather than an academic one, we conduct a more searching inquiry. See *Missouri v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (academic decisions "call[ ] for far less stringent procedural requirements").

418 F.3d at 633-34.

*Goss v. Lopez*, 419 U.S. 565 (1975), relied on by the Sixth Circuit in *Flaim* to support the conclusion that higher education disciplinary decisions implicate due process concerns, involved a challenge to the constitutionality of a high school student's 10-day suspension from school without a hearing. The Court found that Goss had a protectable state-created property interest in continuing his public education, entitling him to certain constitutional protections in the deprivation of that right. "Although Ohio may not be constitutionally obligated to establish and maintain a public school system, having done so it must provide minimum procedures before a deprivation." *Goss* also recognized a liberty interest: "The Due Process Clause also forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437(1971) and *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972)). "It is apparent that the claimed right of the State to determine unilaterally and without process whether [ ] misconduct has occurred immediately collides with the requirements of the Constitution." *Goss*, 419 U.S. at 574.

It has long been recognized that state-created property interests may give rise to Fourteenth Amendment due process protections. *Roth*, 408 U.S. at 577 ("The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests-property interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ...."). *See also Rogers v. Tennessee Bd. of Regents*, 273 Fed.Appx. 458, 462 (6th Cir. 2008) (analyzing the sufficiency of the process afforded a university nursing student based on a right created by Tennessee law which provided plaintiff with a constitutionally protected interest in her nursing education); *Ku*, 322 F.3d at 435 (assuming a constitutionally protected interest in continuing medical education based on Tennessee law which clearly recognized such a right).

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.231 Filed 02/18/21 Page 27 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

Michigan state courts have recognized that the right to continue a course of higher education warrants constitutional protection. Michigan courts have not distinguished higher public education from high school programs when discussing such procedural protections and have relied on *Goss* in recognizing that public university students have a property interest in their continued education. [3] *See Imtiaz v. Board of Regents of the University of Michigan*, Nos. 253107, 253109, 2006 WL 510057, at *4 (Mich. Ct. App. March 2, 2006) (citing *Goss* for the proposition that the right to a public education has been recognized as a legitimate property or liberty interest protected by due process and relying on the Sixth Circuit's opinion in *Flaim* for the proposition that in the context of higher education disciplinary actions, no greater process is required than notice and an opportunity to be heard). Notably, in *Imtiaz*, the court also discussed the fact that governing boards of Michigan's public universities enjoy a unique constitutional status and that "in educational matters, the independence of Michigan's public universities is well established." 2006 WL 510057 at *6. Notwithstanding this autonomy, the court did not question the fact that the right to higher education is protected by procedural due process and that the Board of Regents was obligated to afford plaintiff notice and an opportunity to be heard. *Id. See also Zwick*, 2008 WL 1902031, at *5 ("relying on relevant Michigan state court decisions and persuaded by the logic of fellow federal courts," to find "that continued enrollment in a public university amounts to a property interest and a student is thus afforded protection from arbitrary dismissal under the Due Process clause.").

*11 Plaintiff has alleged sufficient facts, particularly with regard to the notice that she received and the opportunity that she was given to respond to the charges against her, to state a claim of procedural due process that survives Defendants' motion to dismiss.[4] Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim based on procedural due process against the individual Defendants in their individual capacities.

**D. Qualified Immunity**

Defendants argue that, even assuming the Court finds that Plaintiff had a protected property interest in her nursing education, and therefore was entitled to a certain amount of procedural due process before a deprivation of that right, the law on this issue was not clearly established at the time Plaintiff was expelled in 2007. (Defs.' Mot. 7-8.) In order to assert a violation of a "clearly established" right

and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987). " 'A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits thatis directly on point.' " *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2009) (quoting *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002)).

In their motion to dismiss, Defendants maintain that a reasonable university official in 2007 could not have known that Plaintiff was entitled to *any* type of notice or opportunity to be heard before they expelled her from the nursing school based on alleged ethics code violations. The Court disagrees and concludes that Plaintiff's property interest in her continued education, and her related right to procedural due process with respect to any deprivation of that interest, were clearly established in this Circuit in 2007 when Plaintiff was expelled. *Flaim* in particular, and also *Picozzi, supra, Jaksa v. Regents of the University of Michigan*, 787 F.2d 590 (6th Cir. 1986), *Hart v. Ferris State College*, 557 F. Supp. 1379, 1382 (D. Mich. 1983) and other decisions that were published in 2007, stand as precedent clearly establishing that Plaintiff was entitled to some form of due process protection before her expulsion from the nursing school. Indeed, the University's own internal procedures, which Defendants claim to have followed in Plaintiff's case, appear to recognize an obligation in this regard.

Neither of the two unpublished cases, *McGee, supra*, issued in 2006 and *Lee, supra*, issued in 2007, that Defendants cite to support their assertion that "[t]he issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved," compels a different conclusion. Significantly, in *Lee*, Magistrate Judge Brenneman concluded, before embarking on a gratuitous discussion of the clearly established nature of the right Lee asserted, that even if a property interest did exist that entitled Lee to procedural due process protection, it was not implicated in Lee's case because Lee was not actually expelled from the university but was only placed on probation. 2007 WL 2827828, at *6-7. Thus, Magistrate Judge Brenneman's entire discussion of the clearly established nature of the right to procedural due process in the university setting was dicta. Secondly, without significant analysis, Magistrate Judge Brenneman criticized the Sixth Circuit's opinion in *Flaim* for relying

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.232 Filed 02/18/21 Page 28 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

on *Jaksa, supra,* dismissing the *Jaksa* decision as a "four-sentence, unpublished affirmance." 2007 WL 2827828, at \*8. Magistrate Judge Brenneman then implied that the published decision in *Flaim* was somehow undercut by the unpublished decision in *McGee,* which stated (also in dicta) that the issue of whether a student's interest at a post-secondary school is protected by procedural due process was not resolved, but failed to address or even mention *Flaim.* Magistrate Judge Brenneman then lumped together what he perceived to be a lack of clarity in the law on "procedural or substantive due process rights" to a post-secondary school education, without addressing the important differences in the nature of the "judicial debate" surrounding these very separate and distinct constitutional claims. *Lee* is not only analytically unpersuasive but it is also of no precedential value.[5]

\*12 In another unpublished decision, *Edmunds v. Bd. of Control of Eastern Mich. Univ.,* No. 09-11648, 2009 WL 5171794, at \*5 (E.D. Mich. Dec. 23, 2009), not cited by Defendants, the district court relied on *McGee* for the proposition that it remained unresolved in the Sixth Circuit whether a university student even has an interest in continued enrollment, let alone an on-time graduation, which was claimed in *Edmunds.* As in *Lee,* the court's citation to *McGee* in *Edmunds* was in dicta and the court found it unnecessary to decide in that case whether plaintiff had a protectable property interest in a university education because it concluded that any process that was due, assuming such an interest did exist, had been afforded. The court in *Edmunds* never addressed a qualified immunity/clearly established issue and never mentioned or addressed the Sixth Circuit's opinion in *Flaim.*

Other district courts in this circuit have recognized the precedential value of *Flaim* on this issue. In *Nguyen v. University of Louisville,* No. 04-cv-457, 2006 WL 1005152, at \*4 (W.D. Ky. April 14, 2006) the Court granted qualified immunity to university officials on a procedural due process claim because "[a]t the time of Nguyen's suspension in 2004, no Sixth Circuit or Supreme Court decision clearly established that a graduate student, such as Nguyen, has a constitutionally protected property interest in continuing his studies at a public university." The court then noted that such a right became clearly established later, when the Sixth Circuit decided *Flaim* in 2005: "Not until 2005 did the Sixth Circuit Court of Appeals acknowledge that such a property right exists." 2006 WL 1005152, at \*4 (citing *Flaim,* 418 F.3d at 633). *See also Jaber v. Wayne State University Bd. of Governors,* ___ F. Supp. 2d ___, 2011 WL 824644, at \*3

(E.D. Mich. March 7, 2011) (citing *Flaim* and finding that "[i]n the Sixth Circuit, the Due Process Clause is implicated by higher education disciplinary decisions.").

In fact, as early as 1983, a district court in this circuit, in a case involving expulsion from a public university, held that: "It is undisputed that the threat of suspension or expulsion implicates plaintiff's property and liberty interests in public education and reputation, and that such interests are within the purview of the due process clause of the Fourteenth Amendment." *Hart,* 557 F. Supp. at 1382 (citing *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) and *Dixon v. Alabama State Board of Education,* 294 F.2d 150, *cert. denied,* 368 U.S. 930 (1961)).

Again, in 1986, another district court in this circuit, in a case involving a University of Michigan law school student, recognized that public university students have a protected interest in continuing their higher education studies:

A public university student has a protected interest in continuing his studies. *See Ewing v. Board of Regents of the University of Michigan,* 742 F.2d 913, 915 (6th Cir. 1984), *rev'd* (other grounds), 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) ("[A]n implied understanding that a student shall not be arbitrarily dismissed from his university is a property interest...."); *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 157 (5th Cir. 1961), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); *Stoller v. College of Medicine,* 562 F. Supp. 403, 412 (M.D. Pa. 1983), affd (without opinion), 727 F.2d 1101 (3d Cir. 1984) ("[A] graduate student has a 'property' interest in continuing his studies."); *Hall v. University of Minnesota,* 530 F. Supp. 104, 107 (D. Minn. 1982) ("A student's interest in attending a university is a property right protected by due process."). This is as it should be. Education is the key-or at least the prerequisite-to many successful careers, including a career in law. *See Dixon,* 294 F.2d 157. When the government provides professional graduate education, it should do so within the constraints of due process.

\*13 *Picozzi,* 623 F. Supp. at 1576 (holding also that whether the interest is best termed "property" or "liberty" is not material where plaintiff clearly has an interest triggering due process.").

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.233   Filed 02/18/21   Page 29 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)
2011 WL 13124122

As District Judge Victoria Roberts noted in a recent published opinion, *Flaim* established in this circuit that "the Due Process Clause is implicated by higher education disciplinary decisions." *Jaber*, 2011 WL 824644, at *3. Contrary to Magistrate Judge Brenneman's assertion otherwise in *Lee*, the decision in *Flaim* provided citation to significant relevant authority in concluding that the Sixth Circuit has "held that the Due Process Clause is implicated by higher education disciplinary decisions." 418 F.3d at 633-34.

The Court concludes that the opinions in *Goss, Flaim, Jaksa, Hart, Picozzi*, in addition to others, defeat Defendants' argument that the law was not clearly established in this circuit in 2007 that Plaintiff had a protected property interest in her nursing school education that entitled her to a certain amount of procedural due process.

Defendants do not even attempt to address *Flaim* in either their motion or their reply brief, despite Plaintiff's reliance on *Flaim* in her response. Nor could Defendants adequately distinguish *Flaim* upon questioning by the Court at oral argument. Defendants cannot ignore a published Sixth Circuit decision directly on point and rely instead on dicta from two unpublished opinions that similarly fail to adequately address that precedent, to cast doubt on the clearly established nature of a right that was expressly recognized in a binding Sixth Circuit opinion, and several district court opinions in this circuit, at the time of Plaintiff's expulsion.[6] As in *Dixon*, the "landmark case" in this arena, the question presented by Defendants' motion to dismiss "does not concern the sufficiency of the notice or the adequacy of the hearing, but is whether [Plaintiff] had a right to any notice or hearing whatever before being expelled." *Dixon*, 294 F.2d at 154.

The Court concludes that the right to some degree of notice and an opportunity to be heard before an expulsion from a public university for disciplinary reasons was clearly established at the time of Plaintiff's expulsion in 2007. Plaintiff has thus stated a facially valid claim against the individual Defendants in their individual capacities under 42 U.S.C. § 1983. Accordingly, the Court DENIES

Defendants' motion to dismiss this claim. The merits of Plaintiff's contention that she was afforded insufficient process, which Defendants have already challenged in their pending motion for summary judgment, remains to be tested and the Court expresses no opinion on whether Plaintiff received all of the process that she was due when she was expelled from the nursing school in 2007 or whether her right to more process than she received was clearly established at that time.[7]

## IV. CONCLUSION

*14  Accordingly, the Court:

(1) GRANTS Defendants' motion to dismiss all claims against the University of Michigan Board of Regents;

(2) GRANTS Defendants' motion to dismiss Plaintiff's 42 U.S.C. § 1983 claim against the Individual Defendants in their official capacities for monetary or other retrospective relief;

(3) GRANTS Defendants' motion to dismiss Plaintiff's Substantive Due Process Claims (Counts I and III);

(4) GRANTS Defendants' motion to dismiss Plaintiff's Michigan Procedural Due Process Claims (nts' motion to dismiss Plaintiff's Michigan Procedural Due Process Claims (Count IV));

(5) GRANTS Defendants' motion to dismiss Plaintiff's Respondeat Superior claim (Count VI); and

(6) DENIES Defendants' motion to dismiss Plaintiff's Fourteenth Amendment Procedural Due Process Claim against the Individual Defendants (Count II).

IT IS SO ORDERED.

Dated: September 28, 2011.

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13124122

## Footnotes

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.234 Filed 02/18/21 Page 30 of 42

Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)

2011 WL 13124122

1     There is some authority for the proposition that an action may lie against the State (or an arm of the State also entitled to Eleventh Amendment immunity) under the Michigan Constitution where no other remedy is available. *Smith v. Dep't of Public Health*, 428 Mich. 540, 544, aff'd sub nom, *Will v. Dep't of State Police*, 491 U.S. 58 (1989). However, Plaintiff has not provided the Court with authority establishing that any such action has ever been expressly recognized by Michigan courts.

2     Even assuming that Plaintiff had pleaded facts which state a claim of substantive due process, as the above discussion makes clear, such a fundamental right was not clearly established at the time of Plaintiff's expulsion and the individual Defendants would be entitled to qualified immunity on any substantive due process claim that did survive Defendants' motion to dismiss the claim as a matter of law. "If judges thus disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Lee*, 2007 WL 2827828, at *9 (citing *Wilson v. Layne*, 526 U.S. 603, 618 (1999)). The same cannot be said with respect to Plaintiff's procedural due process claim. As the Court concludes *infra*, with respect to that claim, published Sixth Circuit case law at the time of Plaintiff's expulsion in 2007 clearly established that Plaintiff was entitled to some degree of procedural due process with respect to her property right in her continued nursing school education. *See infra* discussion at 17-19.

3     Indeed, any suggestion that the distinction between a public high school and a public university or college is of constitutional significance is suspect based on the fact that the Supreme Court in *Goss* cited the Fifth Circuit's opinion in *Dixon v. Alabama State Bd.of Education*, 294 F.2d 150, 157 (5th Cir. 1961), cert, denied, 368 U.S. 930 (1961), a case that required notice and an opportunity to be heard in connection with a student's expulsion for misconduct from a state tax-supported college, as the "landmark decision" following which "the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion." *Goss*, 419 U.S. at 577 n. 8.

4     The Court expresses no opinion on whether Plaintiff's procedural due process claim can also survive Defendants' already-filed motion for summary judgment.

    Given the Court's instant ruling on Plaintiff's procedural due process claim, the Court Orders Plaintiff to file her response to Defendants' pending motion for summary judgment on or before October 21, 2011.

5     Interestingly, in an unpublished and unreported "Order" resolved by a panel of three judges and signed by the Clerk of the Court, the Sixth Circuit affirmed the district court's ruling in *Lee* without addressing the "clearly established" issue, agreeing with the district court's conclusion that Lee had received all of the process he was due. The Sixth Circuit "assumed, without deciding, that the Due Process Clause is implicated in Lee's case by the University's disciplinary action." *Lee v. University of Michigan-Dearborn, et al.*, No. 07-2391, Slip Op. at 4 (6th Cir. Aug. 5, 2008). In support of this "assumption," the Sixth Circuit relied on *Goss*, *Jaksa* and *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988), a First Circuit opinion in which the court did not merely "assume" but clearly held that "a student facing expulsion from a public educational institution [in that case a university] is entitled to the protections of due process." Although the Sixth Circuit, in affirming the district court's ruling in *Lee*, relied on *Flaim*, it did so to support its conclusion that Lee received all of the process that he was due. It is unclear why the Order in *Lee* avoided relying on *Flaim* for the established proposition that due process was implicated by the university's actions in that case, perhaps because Lee was not actually expelled. In any event, the Court declines to read the unpublished, unreported Order in *Lee* as undercutting in any way the published opinion of the Sixth Circuit in *Flaim*.

6     It is interesting to note that in *Zwick*, *supra*, where the defendant Board of Regents was represented by the same counsel representing the Board in the instant case, counsel did not make a qualified immunity argument based on the lack of a clearly established right to due process, despite the fact that both *Lee* and *McGee* were reported decisions at the time.

7     While Plaintiff's federal procedural due process claims against the individual Defendants survive Defendants' motion to dismiss, Plaintiff's state procedural due process claims are dismissed. *See Jones v. Powell*,

**Martinson v. Regents of the University of Michigan, Not Reported in Fed. Supp. (2011)**

2011 WL 13124122

462 Mich. 329, 335-37 (2000) (no implied damages remedy exists against governmental employees in their individual capacities for violations of any state constitutional right where other remedies, such as an action under § 1983, are available).

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-13409-LJM-KGA    ECF No. 12-1, PageID.236    Filed 02/18/21    Page 32 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)

2017 WL 2117978

2017 WL 2117978
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Joanne ODOM and Reginald Whitlow, Plaintiffs,
v.
UNIVERSITY OF MICHIGAN, University
of Michigan Health System, Russ Laurin,
and Kathy Jordan-Sedgeman, Defendants.

Civil Case No. 16-12791
|
Signed 05/16/2017

**Attorneys and Law Firms**

Adam Michael Taub, Richard G. Mack, Miller Cohen P.L.C., Detroit, MI, for Plaintiffs.

**OPINION AND ORDER (1) GRANTING
DEFENDANTS' MOTION TO DISMISS AND FOR
JUDGMENT ON THE PLEADINGS (ECF NO. 19)
AND (2) GRANTING PLAINTIFFS' MOTION TO
STRIKE DEFENDANTS' REPLY BRIEF (ECF NO. 29)**

LINDA V. PARKER, U.S. DISTRICT JUDGE

**\*1** This lawsuit arises from the termination of Plaintiffs' positions with University of Michigan Health System ("UMHS") in July 2013. In an Amended Complaint filed August 1, 2016, Plaintiffs assert: (I) a claim under 42 U.S.C. § 1983 for Defendants' alleged violation of Plaintiffs' Fourteenth Amendment due process right to a neutral decision-maker at their post-termination hearing, and (II) an age discrimination claim under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). Presently before the Court is Defendants' "Motion to Dismiss and for Judgment on the Pleadings," filed October 17, 2016. (ECF No. 19.) Plaintiffs filed a response to the motion on November 7, 2016. (ECF No. 23.) Defendants filed a reply brief on February 2, 2017, which Plaintiffs move to strike because it was untimely.[1] (ECF Nos. 28, 29.)

In their motion, Defendants first argue that Eleventh Amendment immunity bars Plaintiffs' § 1983 claim against the University of Michigan ("UofM"), UMHS, and the individual defendants to the extent they are sued in their official capacities for monetary relief. Thus, Defendants seek dismissal of this claim pursuant to Federal Rule of Civil Procedure 12(b)(1). Next, Defendants cite Federal Rules of Civil Procedure 12(b)(6), (c), and 56 in support of their request to dismiss Plaintiffs' § 1983 claim against the individual defendants, to the extent they are sued in their individual capacities.[2] Specifically, Defendants contend that the individual defendants are entitled to qualified immunity because Plaintiffs cannot establish a violation of their Fourteenth Amendment rights.[3] Finally, Defendants argue that the Court lacks subject matter jurisdiction to adjudicate Plaintiffs' pendent state-law claim and thus this claim also must be dismissed pursuant to Rule 12(b)(1).

**I. Applicable Standards**

**\*2** A motion to dismiss on the ground that sovereign immunity bars the plaintiff's claims is properly treated as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). See Lee Testing & Eng'g, Inc. v. Ohio Dep't of Transp., 855 F. Supp. 2d 722, 725 (S.D. Ohio 2012); see also Nair v. Oakland Cty. Cmty. Health Auth., 443 F.3d 474, 476 (6th Cir. 2006). When a defendant raises the issue of subject matter jurisdiction, the plaintiff generally bears the burden of establishing jurisdiction. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998). However, " 'the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity.' " Nair, 443 F.3d at 474 (quoting Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002)).

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1134 (6th Cir. 1996). A Rule 12(c) motion for judgment on the pleadings is subject to the same standard of review as a Rule 12(b)(6) motion. Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998).

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive motion brought under Rule

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.237 Filed 02/18/21 Page 33 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)
2017 WL 2117978

12(b)(6) or (c), a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action...." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets

this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

**\*3** "A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II. Factual Background

UofM owns and operates UMHS. (Am. Compl. ¶ 4, ECF No. 4.) Defendant Russ Laurin was employed in UMHS' Human Resources Department at all times relevant to this lawsuit. (*Id.* ¶ 5.) Defendant Kathy Jordan-Sedgeman was employed as the Director of Labor Relations for UMHS during the relevant period. (*Id.* ¶ 6.)

On or about August 9, 2005, Plaintiff Joanne Odom ("Ms. Odom") began working for UMHS as a linen distribution supervisor. (*Id.* ¶ 10; Pls.' Resp. Br., Ex. A ¶ 2, ECF No. 23-2.) Ms. Odom subsequently was transferred to the position of Patient Transportation Supervisor. (Am. Compl. ¶ 10, ECF No. 4.) On or about January 15, 2008, Plaintiff Reginald Whitlow ("Mr. Whitlow") began working for UMHS as a Multifunctional Material Management Intermediate Supervisor. (*Id.* ¶ 13.) LaKita Pogue supervised Ms. Odom and Mr. Whitlow (collectively "Plaintiffs") during their employment. (*Id.* ¶ 17.)

In an affidavit submitted in response to Defendants' motion, Ms. Odom asserts that when she was hired, she met with Deborah Cobbs, the manager of patient transportation, and Rolando Crooks, the director of the linen department. (Pls.' Resp. Br., Ex. A ¶ 3, ECF No. 23-2.) Ms. Odom attests that during this meeting, Ms. Cobbs "promised me that I can continue working at the University until I voluntarily retired, which would be in 2022." (*Id.* ¶ 4.) Ms. Odom further

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.238 Filed 02/18/21 Page 34 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)

2017 WL 2117978

states that Ms. Cobbs also "promised ... that as long as I am following the employment policies and procedures of the University of Michigan, I am guaranteed to keep my job." Ms. Odom claims that Ms. Cobbs was the person responsible for terminating her employment, if necessary, and "[t]hus, she spoke with authority when making the statements." (*Id.*)

Ms. Odom also asserts in her affidavit that supervisors in the patient transportation department trained with human resources at least once a year and "[t]he human resources department trainers would repeatedly say that as long as we follow the UofM employment policies and procedures, we can continue to be employed and be promoted up the employment ladder." (*Id.* ¶ 6.) Ms. Odom claims that she heard this statement from the time she began working at UofM, until the year she was discharged. (*Id.*)

On or about July 30, 2013, Plaintiffs learned that there had been an investigation concerning whether they had committed time sheet fraud by falsely reporting hours worked. (Am. Compl. ¶ 22.) The investigation concluded that Plaintiffs were not working for numerous hours they reported on their time sheets. (*Id.* ¶ 23.) Plaintiffs dispute this finding. Nevertheless, their employment was terminated in late July 2013, and they were placed on a list precluding their employment with any UofM entity. (*Id.* ¶¶ 29, 31.)

According to Plaintiffs, "Defendants have a policy of treating employees fairly and equitably." (*Id.* ¶ 32.) Managers are advised to suspend, discipline, and discharge employees only as needed. (*Id.*) Defendants utilize progressive discipline and provide for a Disciplinary Review Committee prior to terminating an employee for misconduct. (*Id.* ¶¶ 33, 37.) Defendants afford an employee "the opportunity to file a grievance on matters associated with their employment relationship with Defendants or enter into a dispute resolution process to facilitate resolving misunderstandings and maintain positive work relationships." (*Id.* ¶ 40.) Grievances concerning discharge begin at the third and final step of Defendants' disciplinary process. (*Id.*)

*4 Step 3 goes to the University Grievance Review Committee ("GRC"). (*Id.* ¶ 41.) The GRC includes the following: the head of the aggrieved employee's operating unit or a designated representative, responsible for the answer; an appropriate Director of Human Resources or a designated representative, who presides and is responsible for conducting the review; and an employee not employed in the vice presidential or vice chancellor area in which the

aggrieved employee works, who is selected by the aggrieved employee from a panel appointed by the Vice Presidents and Vice Chancellors. (*Id.*) At the hearing before the GRC, the aggrieved employee may present all relevant information, but should not expect to call witnesses, take testimony, or have the proceedings recorded electronically. (*Id.*)

The GRC heard Plaintiffs' grievances concerning their termination. (*Id.* ¶ 43.) Plaintiffs were not given the opportunity to call witnesses. The panel included only Defendants' managers and officers. (*Id.*) Plaintiffs' employment was not reinstated following the GRC's review. (*Id.* ¶ 44.)

## III. Applicable Law & Analysis

### A. Eleventh Amendment Immunity
The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although on its face the Eleventh Amendment prohibits only suits brought against a state by "Citizens of another State" or "Citizens or Subjects of any Foreign State," the Supreme Court has long construed the Amendment to protect states from suits filed by their own citizens in federal court. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1 (1980).

Eleventh Amendment immunity extends to states and their agencies. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143 (1993); *Abick v. State of Mich.*, 803 F.2d 874, 876 (6th Cir. 1986). Defendants assert, and Plaintiffs do not dispute (Pls.' Resp. Br. at 12 n.4, ECF No. 23 at Pg ID 212), that UofM (which owns and operates UMHS) is a state agency to which the Eleventh Amendment applies. *See Estate of Ritter v. Univ. of Mich.*, 851 F.2d 846, 848 (6th Cir. 1988). Under the Eleventh Amendment, a

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.239 Filed 02/18/21 Page 35 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)
2017 WL 2117978

state and its agencies are immune from actions for damages and injunctive relief unless immunity is validly abrogated by Congress or expressly waived by the state. *See Seminole Tribe of Florida*, 517 U.S. at 54-55; Thiokol Corp. v. *Dep't of Treasury, State of Mich., Revenue Div*, 987 F.2d 376, 381 (6th Cir. 1993). Neither Congress nor the State of Michigan have waived Eleventh Amendment immunity for suits brought under § 1983. *See Kentucky v. Graham*, 473 U.S. 159, 169 n.17 (1985) (citations omitted); *McCoy v. Michigan*, 369 Fed.Appx. 646, 653 (6th Cir. 2010).

As such, Plaintiffs' § 1983 claim against UofM and UMHS are subject to dismissal. [4]

**\*5** Eleventh Amendment immunity also extends to suits against state officials sued for monetary damages based on their conduct in their official capacities because such lawsuits are not suits against the officials themselves but in fact are suits against the office of the officials, i.e. against the state itself. *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Plaintiffs do not contest this point, but contend that under *Ex Parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment does not bar this federal court from " 'issu[ing] prospective injunctive and declaratory relief compelling a state official to comply with federal law.' " (Pls.' Resp. Br. at 13 (quoting *S&M Brands*, 527 F.3d at 507).) According to Plaintiffs, they "request that this Court enjoin Defendants from continuing to employ practices that violate the Due Process rights of their employees...." (*Id.*) Yet, Plaintiffs do not seek such relief in their Amended Complaint. [5]

Therefore, the Court also concludes that Plaintiffs' § 1983 claim against the individual defendants in their official capacities are barred by the Eleventh Amendment and must be dismissed without prejudice. Defendants do not contend that the individual defendants are entitled to Eleventh Amendment immunity to the extent they are sued in their individual capacities, as they in fact are not. *See, e.g., Hardin v. Straub*, 954 F.2d 1193 (6th Cir. 1992) (explaining the difference between official and individual capacity suits and that a state officer sued in the latter capacity cannot advance Eleventh Amendment immunity as a defense).

**B. Due Process**

Plaintiffs allege that Defendants deprived them of their Fourteenth Amendment due process right to a post-termination hearing before a neutral decision-maker. Defendants argue, however, that Plaintiffs lacked a property interest in their employment entitling them to due process protection.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id* at 577; *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989). "A public employee does not have a property interest in continued employment when his position is held at the will and pleasure of his superiors and when he has not been promised that he will only be terminated for good cause." *Chilingirian*, 882 F.2d at 203.

In Michigan, employment contracts for an indefinite term are presumed to be at-will and may be terminated by either party at any time for any reason. *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 597 (Mich. 1993) (citation omitted); *see also Pucci v. Ninteenth Dist. Court*, 628 F.3d 752, 766 (6th Cir. 2010) (citing *Lytle v. Malady*, 579 N.W.2d 906-910-11 (Mich. 1998)) ("Michigan law generally presumes that employment relationships are 'at-will' arrangements; at-will employees, in turn, have no property interest in their continued employment."). A party may overcome this presumption, however, in one of three ways:

"(1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee."

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.240   Filed 02/18/21   Page 36 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)
2017 WL 2117978

*6  Pucci, 628 F.3d at 766 (quoting Lytle, 579 N.W.2d at 911).

In their Amended Complaint, Plaintiffs rely on Defendants' policy "of treating employees fairly and equitably" and their progressive disciplinary procedures to show that employees had "a legitimate expectation of job security[.]" (Am. Compl. ¶¶ 32-42.) In response to Defendants' motion, Plaintiffs also rely on Ms. Odom's affidavit, attesting to statements made to her concerning her future as an employee. [6]

"In general, a jury can find the existence of a legitimate expectation [of job security] based on the 'employer's written policy statements set forth in [a] manual of personnel policies.' " Mannix v. Cty. of Monroe, 348 F.3d 526, 534 (6th Cir. 2003) (quoting Toussaint v. Blue Cross & Blue Shield of Mich., 292 N.W.2d 880, 885 (Mich. 1980)). Nevertheless, the Michigan courts have advised that "the trial court should only allow the case to proceed if the 'policies are reasonably capable of being interpreted as promises of just-cause employment.' " Id. (quoting Rood, 507 N.W.2d at 606). " 'Neither the adopting of systematic procedures for dealing with employees nor the creating of disciplinary guidelines transforms an at-will relationship into one prohibiting discharge except for just-cause.' " Id. (quoting Mitchell v. White Castle Sys., No. 94-1193, 1996 WL 279863, at *5 (6th Cir. 1996) (unpublished op.); see also Biggs v. Hilton Hotel Corp., 486 N.W.2d 61, 63 (Mich. Ct. App. 1992) ("The fact that [the] defendant had established a disciplinary system for its employees and, apparently, obligated [the] plaintiff to abide by that disciplinary system in dealing with his subordinates does not establish unequivocally [the] plaintiff's position that he was a just-cause employee rather than an at-will employee.").

As the Michigan Court of Appeals explained in Briggs, the fact that an employer creates a disciplinary system for dealing with employees does not justify the employee harboring any legitimate expectation of just-cause employment:

> Certainly, it is not unreasonable to expect that an employer, particularly one such as defendant that employs a large number of individuals, would want a systematic method of dealing

with its employees and would provide a consistent set of guidelines under which its managers would deal with subordinates. This does not mean that by doing so an employer establishes just-cause employment rather than at-will employment.

486 N.W.2d at 63. " 'If such documents were sufficient, no employer could ever establish policies informing its employees of reasons why they could be fired without creating a 'just-cause' labor force.' " Mannix, 348 F.3d at 535 (quoting Mitchell, 1996 WL 279863, at *5). Thus, "[p]olicy statements of fairness and a commitment to maintain good will, loyalty, and harmony among employees are not inconsistent with at-will employment and do not objectively support just-cause employment." Schultz v. Mem'l Healthcare Ctr., No. 230774, 2002 WL 1308635, at * (Mich. Ct. App. June 14, 2002) (citing Rood, 507 N.W.2d at 601-02).

*7  The policies on which Plaintiffs rely are insufficient to create an issue of fact under a "legitimate expectations" theory because there is no evidence that Defendants represented that an employee could be discharged only after the procedures had been followed. See Bailey v. Dover Elevator Co., No. 93-1493, 1994 WL 198194, at *3 (6th Cir. May 19, 1994) (unpublished op.) (citing Baggs v. Eagle-Picher Indus., Inc., 957 F.2d 268, 271-72 (6th Cir. 1992)) (concluding that an employee handbook providing for fair treatment and a progressive discipline system did not create a jury question as to whether the plaintiff could be discharged only for cause because the handbook never expressly stated that employees would be discharged only for cause); see also Biggs, 486 N.W.2d at 63. Plaintiffs do not point to anything in Defendants' policies or procedures expressly representing that employees would be discharged only for cause. In comparison, the employee manuals in almost all of the cases Plaintiffs cite expressly promised employees that they would be terminated "for just cause only." [7] Toussaint, 292 N.W.2d at 884 (explaining that the plaintiff was "handed a manual of Blue Cross personnel policies which ... stated ... that it was the 'policy' of the company to release employees 'for just cause only.' "); see also Khalifa v. Henry Ford Hosp., 401 N.W.2d 884, 888 (Mich. Ct. App. 1986) (quoting manual stating under "discharge" the policy is "Hospital termination for cause.") (emphasis in manual); Gleason v. Bd. of Cty.

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.241 Filed 02/18/21 Page 37 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)

2017 WL 2117978

*Comm'rs of Weld Cty.*, 620 F. Supp. 632, 634 (D. Colo. 1985) (quoting policy manual provisions defining the plaintiff as a "permanent" employee and providing that, as such, she could only be terminated "for cause"). The Court is not persuaded to reach a different result based on the Illinois state court decision Plaintiffs cite as its ruling has no procedural value.

Oral statements may be sufficient to create a contract for just-cause employment. *See, e.g.,* Pucci, 628 F.3d at 766. Nevertheless, the Michigan Supreme Court "require[s] such verbal assurances to be clear and unequivocal." *Lytle*, 579 N.W.2d at 171 (citing Rowe, 473 N.W.2d at 273). This requirement is necessary because "individuals often harbor 'optimistic hope of a long relationship' that causes them to misinterpret their employer's oral statements as manifestations of an intention to undertake a commitment in the form of a promise of job security." *Rood*, 507 N.W.2d at 598 (citing Rowe, 473 N.W.2d at 273). " '[N]either party to the beginning of an employment relationship expects it to be unsatisfactory, and both hope it will have a significant duration.' This hope and noncontractual wish is expressed in terms of language such as 'as long as you do the job.' " Rowe, 473 N.W.2d at 273 (quoting Carpenter v. Am. Excelsior Co., 650 F. Supp. 933, 936 n.6 (E.D. Mich. 1987)). Thus, "any orally grounded contractual obligation for permanent employment 'must be based on *more than* an expression of an optimistic hope of a long relationship.' " *Id.* (emphasis added in *Rowe*).

In *Rowe*, the Michigan Supreme Court indicated that "[i]n determining whether a reasonable factfinder can find a promise of job security implied in fact, we look to all the facts and circumstances to evaluate the intent of the parties." 473 N.W.2d at 273. This is an objective evaluation. *Id.* "The starting point in analyzing oral statements for contractual implications is to determine the meaning that reasonable persons might have attached to the language, given the circumstances presented." *Id.* Relevant to the evaluation are whether the statements were made in connection with "preemployment negotiations regarding [job] security" or in response to the plaintiff's "inquiry regarding job security" and whether "the terms were specifically negotiated." *Id.* at 274. An employer's vague statements or those "couched in general terms, more akin to stating a policy as opposed to offering an express contract" are insufficient to indicate an

intent to form a contract for permanent employment. *Id.* at 275.

To establish an oral promise of just-cause employment, Plaintiffs rely on Ms. Cobbs' alleged promise at the time of Ms. Odom's hiring that Ms. Odom could continue working at the University until she voluntarily retired. Plaintiffs also rely on the alleged statements by Ms. Cobbs and unnamed human resources department trainers that as long as employees followed UofM's employment policies and procedures, they were guaranteed to keep their job. Such statements, however, are equivalent to those the Michigan courts have found not reflective of a clear or unequivocal promise of permanent- or just-cause employment, but instead optimistic hopes about the future of the plaintiff's employment that will not suffice to prove just-cause employment. *See, e.g.,* Rowe, 473 N.W.2d at 268 (concluding that the statements made to the plaintiff at her initial interview that as long as she sold, she would have a job at Montgomery Ward, did not clearly indicate an intent to form a just-cause employment relationship); Barber v. SMH (US), Inc., 509 N.W.2d 791, 795 (Mich. Ct. App. 1993) (holding that statements made during preemployment negotiations with representatives of the employer that the plaintiff would be employed "as long as he was profitable and doing the job," did not give rise to a just-cause claim where the plaintiff did not specifically assert that the promise was made in response to his articulated concerns that he be terminated for just cause only); Biggs, 486 N.W.2d at 63 (finding that the general manager's comments to the plaintiff during preemployment interviews to the effect that he saw the plaintiff as a person who would go places with the corporation and that he felt the relationship would be a good one in which there would be an opportunity for the plaintiff to grow and maintain some type of long-term relationship could not induce the belief that termination would be for just cause only); Mitchell, 1996 WL 279863, at *4 (rejecting as a basis for a binding employment contract oral assurances when the plaintiff was hired that "as long as I follow the policy of cash handling and the attendance policy that I would always be assured a job at White Castle.").

**\*8** In short, Plaintiffs fail to create a genuine issue of material fact to overcome the presumption of at-will employment. As such, they cannot establish a property interest in their employment with Defendants protected by the Fourteenth Amendment's Due Process Clause. Therefore, the Court is dismissing with prejudice Plaintiffs' § 1983 due

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.242   Filed 02/18/21   Page 38 of 42

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)

2017 WL 2117978

process claim against Ms. Jordan-Sedgeman and Mr. Laurin, to the extent Plaintiffs are suing them in their individual capacities.

## C. ELCRA

Relying on *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984), Defendants argue that the Eleventh Amendment deprives this federal court of jurisdiction to adjudicate Plaintiffs' state-law age discrimination claim. Defendants are correct with respect to Plaintiffs' claim against UofM, UMHS, and the individual defendants to the extent they are sued in their official capacities for money damages, as the Supreme Court held in *Pennhurst* that "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." 465 U.S. at 121. Defendants' argument does not apply to Plaintiffs' ELCRA claim against the individual defendants to the extent they are sued in their individual capacities, however. As the Court stated earlier, they are not entitled to Eleventh Amendment immunity in their individual capacities.

Nevertheless, this Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367, and the statute provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). District courts have "broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). The court's discretion, however, is circumscribed by considerations of " 'judicial economy, convenience, fairness, and comity.' " *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "After a [Rule] 12(b)(6) dismissal, there is a strong presumption in favor of dismissing supplemental claims." *Id.* at 1255 (citations omitted) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing state law claims, or remanding them to state court if the action was removed.").

This lawsuit has been pending in this Court for only eight months and is at the earliest stages of litigation. Defendants responded to Plaintiffs' Amended Complaint with their motion to dismiss and, besides this motion, no other substantive documents have been filed. Moreover, to the extent Plaintiffs intend to pursue their § 1983 claim against UofM, UMHS, and the individual defendants in their official capacities, the claim must be filed in state court. Thus, they can pursue their state law claim there, as well. It would be an inefficient use of this Court's resources to adjudicate Plaintiffs' state-law claim here while the parties are litigating Plaintiffs' § 1983 claim in state court. This Court cannot identify any prejudice resulting from the litigation of the state law claim there.

For these reasons, the Court finds that it lacks subject matter jurisdiction over Plaintiffs' ELCRA claim against UofM, UMHS, and the individual defendants in their official capacities. The Court is declining to exercise supplemental jurisdiction over Plaintiffs' ELCRA claim against the individual defendants in their individual capacities upon its dismissal of Plaintiffs' § 1983 claim.

## IV. Conclusion

*9 For the reasons set forth above, the Court holds that UofM, UMHS, and the individual defendants to the extent are sued for monetary damages in their official capacities are entitled to Eleventh Amendment immunity. The Court therefore is **DISMISSING WITHOUT PREJUDICE** Plaintiffs' § 1983 and ELCRA claims against these defendants. Plaintiffs did not have a property interest in their employment with Defendants entitling them to due process protection and thus their § 1983 claim against the individual defendants, to the extent they are sued in their individual capacities, fails on the merits and is being **DISMISSED WITH PREJUDICE**. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claim against these defendants and thus the claim is **DISMISSED WITHOUT PREJUDICE**.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to strike Defendants' Reply brief is **GRANTED**

**IT IS FURTHER ORDERED** that Defendants' "Motion to Dismiss and for Judgment on the Pleadings" is **GRANTED**.

Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)

2017 WL 2117978

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2117978

## Footnotes

1    The Court is granting Plaintiffs' motion to strike Defendants' reply brief, as Defendants offer no explanation —much less good cause—for why they filed the brief more than two months beyond its November 21, 2016 due date. *See* Fed. R. Civ. P. 6(b) (granting the court the discretion to extend time "for good cause"). Eastern District of Michigan Local Rule 7.1(e)(1)(C) establishes the following deadline for filing a reply: "within 14 days after service of the response, *but* not less than 3 days before oral argument." (emphasis added). As plainly written, "less than 3 days before oral argument" is not an alternative deadline. Instead, that language means only that the filing deadline is shortened if oral argument is scheduled before the fourteen-day deadline expires.

2    As Defendants filed an Answer to Plaintiffs' Amended Complaint, their motion technically cannot be brought under Rule 12(b)(6) and, instead must be brought pursuant to Rule 12(c). *See McGlone v. Bell*, 681 F.3d 718, 728 n.2 (citing *Satkowiak v. Bay Cty. Sheriff's Dep't*, 47 Fed.Appx. 376, 377 n.1 (6th Cir. 2002)).

   As set forth below, however, motions brought under Rules 12(b)(6) and (c) are evaluated using the same standard.

3    Plaintiffs argue in their response brief that it is premature for the Court to decide this constitutional issue because Plaintiffs have not had the opportunity to develop the factual record and prove that they had a constitutionally recognized property interest in their jobs to give them the right to due process under the Fourteenth Amendment. Plaintiffs do not attach an affidavit or declaration to their response brief, however, showing that they cannot present facts to oppose the motion. *See* Fed. R. Civ. P. 56(d).

4    The dismissal is without prejudice, as the Eleventh Amendment does not bar Plaintiffs from asserting the claim in state court. *See Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005). Notably, with respect to Plaintiffs' § 1983 claim against UofM, UMHS, and the individual defendants in their official capacities, the *only* basis Defendants raise for dismissal is sovereign immunity. In other words, Defendants do not raise sovereign immunity as an "alternative" ground for rejecting Plaintiffs' claim against these defendants. Had Defendants alternatively argued that Plaintiffs' § 1983 claim failed on its merits (as they argue, but only to the extent the claim is asserted against the individual defendants in their individual capacities), the Court may have chosen to ignore their sovereign immunity defense and rule as it does *infra* that Plaintiffs lacked a property interest entitling them to due process protection, which would result in a dismissal with prejudice.

   *See Nair v. Oakland Cty. Cmty. Health Auth.*, 443 F.3d 469, 477 (6th Cir. 2006) (holding that "under any circumstances in which the State (or the United States) declines to raise sovereign immunity as a threshold defense, ... the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order the prefer"). The Court is unaware of precedent suggesting that it has this discretion when the defendant raises sovereign immunity not only as a threshold defense, but as its only defense.

5    For the reasons discussed *infra*, any attempt by Plaintiffs to amend their complaint to request such relief would be futile.

6    Plaintiffs do not relate any similar statements to Mr. Whitlow. Thus, his claim to a property interest in his job appears to depend solely on Defendants' policies and procedures.

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.244   Filed 02/18/21   Page 40 of 42

**Odom v. University of Michigan, Not Reported in Fed. Supp. (2017)**

2017 WL 2117978

7    Plaintiffs cite the Eighth Circuit's decision in *Skeets v. Johnson*, 805 F.2d 767 (1986); however, the en banc court reversed that decision. 816 F.2d 1213 (8th Cir. 1987). The en banc court held that the employer's personnel manual did not create a property interest in the plaintiff's employment. *Id.* at 1215.

---

**End of Document**           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-13409-LJM-KGA ECF No. 12-1, PageID.245 Filed 02/18/21 Page 41 of 42

Zarza v. Board of Regents of University of Michigan, Not Reported in Fed. Supp. (2019)

2019 WL 3556707

2019 WL 3556707
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Karen ZARZA, Plaintiff,

v.

BOARD OF REGENTS OF the
UNIVERSITY OF MICHIGAN, Defendant.

Case No. 18-cv-13862
|
Signed 08/05/2019

**Attorneys and Law Firms**

Michael N. Hanna, Morgan and Morgan, P.A., Southfield, MI, for Plaintiff.

Donald B. Miller, Butzel Long, Detroit, MI, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL DISMISSAL [4]

Arthur J. Tarnow, Senior United States District Judge

**\*1** On December 12, 2018, Plaintiff Karen Zarza, through counsel, commenced this employment discrimination retaliation action against Defendant Board of Regents of the University of Michigan ("U of M"). Before the Court is Defendant's Motion for Partial Dismissal Pursuant to Fed. R. Civ. P. 12(b)(1) [4] filed on April 10, 2019. The Court now finds the Motion suitable for determination without a hearing, in accordance with Local Rule 7.1(f)(2). For the reasons explained below, the Court will **GRANT** Defendant's Motion and **DISMISS without prejudice** Counts II-V of the Complaint.

## STATEMENT OF FACTS

In October 2003, Plaintiff Karen Zarza began working for Defendant U of M as a janitorial supervisor. In August 2013, and again in July 2014, one of Plaintiff's custodian subordinates injured himself on the job. On July 20, 2015, the custodian filed a workers' compensation action pertaining to the injuries that occurred at work under Plaintiff's supervision.

After pursuing the workers' compensation claim, the custodian was fired. On May 8, 2017, the custodian filed an employment discrimination action against U of M in federal district court. Plaintiff, as the custodian's supervisor and as the employee who prepared the incident reports following his accidents, testified in connection with the district court lawsuit.

On May 11, 2017, Plaintiff met with the head of her department to discuss the custodian's termination. At the meeting, she informed the department head of her belief that the custodian had been wrongfully terminated. She also accused U of M of fabricating evidence in connection with the custodian's termination.

On May 25, 2017, Plaintiff had a second meeting with the department head, a human resources representative, and her office manager concerning the custodian's case. Plaintiff claims that, at this meeting, she advised her department head that she would testify honestly in the ongoing lawsuit, which included disclosing her objections to U of M's treatment of the custodian.

Following the meetings with her superiors, Plaintiff began experiencing harassment and hostility in the workplace. On September 11, 2017, Plaintiff was placed on administrative leave. On November 10, 2017, she was fired.

On April 13, 2018, Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). On September 13, 2018, the EEOC issued a Notice of a Right to Sue.

## PROCEDURAL HISTORY

On December 12, 2018, Plaintiff commenced this action alleging retaliation under Section 504 of the Rehabilitation Act (Count I), the Americans with Disabilities Act ("ADA") (Count II), Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") (Count III), the Family Medical Leave Act ("FMLA") (Count IV), and Michigan's Worker's Disability Compensation Act ("WDCA") (Count V).

Plaintiff seeks monetary damages and a declaration that U of M's actions constitute unlawful employment practices in violation of Section 504, the ADA, PWDCRA, FMLA, and WDCA.

Case 2:20-cv-13409-LJM-KGA   ECF No. 12-1, PageID.246   Filed 02/18/21   Page 42 of 42
Zarza v. Board of Regents of University of Michigan, Not Reported in Fed. Supp. (2019)
2019 WL 3556707

**\*2** On April 10, 2019, Defendant filed this Motion for Partial Dismissal pursuant to Fed. R. Civ. P. 12(b)(1) [4]. Plaintiff filed a Response [7] on April 24, 2019. Defendant filed a Reply [9] on May 1, 2019.

## LEGAL STANDARD

Defendant moves to dismiss Counts II–V pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. "Where subject matter jurisdiction is challenged pursuant to 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Mich. S. R.R. Co. v. Branch & St. Joseph Cntys. Rail Users Ass'n., Inc.*, 287 F.3d 568, 573 (6th Cir. 2002).

## ANALYSIS

U of M moves to dismiss Counts II–V on the grounds that it is entitled to Eleventh Amendment sovereign immunity. The Eleventh Amendment "deprives federal courts of subject-matter jurisdiction when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984)).

The U of M Board of Regents is a department of the state and is thus protected by the Eleventh Amendment. *See Estate of Ritter v. University of Michigan*, 851 F.2d 846 (6th Cir. 1988). It is undisputed that U of M has not waived its sovereign immunity in this case. Because neither Title I of the ADA nor the FMLA abrogates the state's Eleventh Amendment immunity, Plaintiff may not sue U of M for money damages under these statutes. *See Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 33 (2012); *Whitfield v. Tennessee*, 639 F.3d 253, 257 (6th Cir. 2011) (internal citations omitted).

Plaintiff, however, claims that she may sue U of M for injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). The *Ex parte Young* doctrine provides that a plaintiff may sue a state official acting in his or her official capacity for prospective injunctive relief to end a continuing violation of federal law. *Whitfield*, 639 F.3d at 257 (quoting *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002)).

*Ex parte Young* does not save Plaintiff's ADA and FMLA claims. Plaintiff is suing the U of M Board of Regents, which is a state entity; she is not suing a state official acting in his or her official capacity. In fact, Plaintiff has not named any U of M official, employee, or member of the Board of Regents in this action. Even if the Court were to construe the Complaint as seeking prospective injunctive relief as Plaintiff suggests, U of M, the sole defendant here, is protected by sovereign immunity. *See Taylor v. Univ. of Michigan*, No. 17-11473, 2018 WL 1322395, at \*6 (E.D. Mich. Feb. 23, 2018), *report and recommendation adopted*, No. 17-cv-11473, 2018 WL 1316165 (E.D. Mich. Mar. 14, 2018).

Plaintiff's state law claims under the PWDCRA and WCDA also fail. "States' constitutional immunity from suit prohibits *all* state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature." *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005) (citing *Pennhurst*, 465 U.S. at 12); *see also Farhat v. Michigan Dep't of Corr.*, No. 12-cv-10864, 2012 WL 5874813, at \*3 (E.D. Mich. Nov. 20, 2012). U of M, as an arm of the State, is entitled to Eleventh Amendment sovereign immunity on the PWDCRA and WDCA claims brought against it this Court.

**\*3** Accordingly,

**IT IS ORDERED** that Defendant's Motion for Partial Dismissal [4] is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts II–V are **DISMISSED** without prejudice.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3556707

---

End of Document   © 2021 Thomson Reuters. No claim to original U.S. Government Works.