UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EGYPTIAN EUROPEAN
PHARMACEUTICAL INDUSTRY, et
al.,

      Plaintiff,

v.

MARK L. DAY

      Defendant.

Case No. 2:20-cv-13409
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [16]

---

Egyptian European Pharmaceutical Industry ("EEPI") and Dr. Layla Fakhr El-Din El-Sawy sought to collaborate with Dr. Mark Day at the University of Michigan to research the properties of *A. maritima*, a plant native to Egypt, and jointly develop a cancer drug. But, instead of a fruitful collaboration, EEPI and El-Sawy allege that Day discriminated against El-Sawy because she is an Egyptian, Muslim woman and a naturalized United States citizen. Plaintiffs also complain that Day interfered with EEPI and El-Sawy's relationship with the University, used unreliable research methods, and failed to provide accurate and scientifically sound reports on his research. Day's actions, Plaintiffs say, harmed El-Sawy's reputation and career prospects, exacerbated her cardiac issues, and caused EEPI to waste money on flawed research.

So EEPI and El-Sawy brought this suit against Day, alleging constructive discharge, hostile work environment, violation of First Amendment rights, retaliation, tortious interference, breach of contract, and fraud and/or negligent misrepresentation. As Plaintiffs' hostile-work-environment claim and Establishment Clause claim are barred by the statute of limitations, the Court will GRANT Day's motion to dismiss with respect to Counts II and III. The Court will also GRANT Day's motion to dismiss Count I with respect to EEPI and Count VII with respect to El-Sawy. Day's motion will otherwise be DENIED.

## I.

## A.

Because Day seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the factual allegations in EEPI and El-Sawy's complaint as true and draws reasonable inferences from those allegations in Plaintiffs' favor. *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

EEPI is an Egyptian company that researches, develops, markets, and distributes pharmaceutical products. (ECF No. 14, PageID.250.) Pharco is its parent company. (PageID.268.)[1]

El-Sawy is a biologist who primarily focuses on cancer research at EEPI. (PageID.256.) El-Sawy and her father, Mohammed El-Sawy, who is also a biologist, researched and developed medicinal uses for *Ambrosia maritima* ("*A. maritima*").

---

[1] All record citations are to ECF No. 14, unless otherwise indicated.

(PageID.256–257.) *A. maritima* is a native Egyptian plant that has been used in traditional medicine to treat a variety of illnesses, including cancer. (*Id.*)

Dr. Mark Day is a University of Michigan scientist who operates the Day Laboratory within the University's Department of Urology. (PageID.250.) El-Sawy first met Dr. Mark Day while she was volunteering at Day Lab in 2010 as a student. (PageID.257.) El-Sawy connected Day to her father and other senior management at EEPI to collaborate on further research involving *A. maritima* and determine whether the plant could be a source of anti-cancer compounds. (PageID.258.)

EEPI and the Regents of the University of Michigan entered into a series of agreements to this end. (PageID.258–263.) The first agreement, executed on June 14, 2012, names Day as the Project Director of a one-year preliminary study of *A. maritima* ("First Research Agreement"). (PageID.258.) Satisfied with the results of the initial study, EEPI and the Regents extended the First Research Agreement through June 30, 2016 ("Amendment No. 1"). (PageID.259.) Also, on July 1, 2015, EEPI and the Regents entered into a second agreement, which provides that Day would be the Principal Investigator for a preclinical investigation of *A. maritima* ("Second Research Agreement"). (PageID.261.) The purpose of this study was to allow EEPI to develop a drug for the treatment of bladder (as well as prostate and breast) cancer from the compounds in *A. maritima* and market this drug in the United States. (PageID.263–264.) The Second Research Agreement includes a reporting provision where the Regents agreed to provide EEPI with written program reports and a final report. (ECF No. 14-4, PageID.343.) It also includes a provision stating that Day and

his research staff will train El-Sawy on various aspects of the research. (*Id*.) EEPI and Pharco also entered into a consulting agreement with Day. (PageID.259–260.)

In 2015, per the Second Research Agreement, El-Sawy came to Day Lab to work on the *A. maritima* preclinical research and receive training from Day. (PageID.265.) It was at this point, according to Plaintiffs, that Day began a "discriminatory campaign" against El-Sawy that was motivated by Day's "contempt" for El Sawy because she is an Egyptian, Muslim woman and a naturalized U.S. citizen. (*Id*.) Plaintiffs allege that Day made discriminatory and threatening comments toward El-Sawy, including "I am a white guy in the United States and I can do whatever the hell I want" and that "I am a Western man and you can't touch me." (PageID.266.) Day also used profane language toward El-Sawy on multiple occasions, which he did not use toward her white, male colleagues. (PageID.267.) Day also approved and endorsed attempts by his wife, Catherine Day, who was also El-Sawy's co-worker, to convert El-Sawy to Christianity. (PageID.267–268.)

Plaintiffs also claim that, during the preclinical study, Day made a number of false statements about the research. Day told EEPI that because his supplies of *A. maritima* were running short, he needed to explore other sources of the chemical compound found in the plant. (PageID.318.) Day charged the "extravagant" expenses for these trips to EEPI. (*Id*.) But, Plaintiffs believe that the supply of *A. maritima* EEPI provided Day was sufficient for the preclinical study, rendering his trips unnecessary. (*Id*.) Day also told EEPI that another plant, *A. hispida*, would be a suitable substitute for *A. maritima* in the preclinical study before he performed a

direct "head-to-head" study to compare the two plants. (PageID.319.) And, according to Plaintiffs, Day falsely stated that "his experiments had generated positive, replicable results which could be used in the further redevelopment of an anti-cancer drug." (PageID.321.)

Events escalated on August 30, 2017. A few days prior, Day was quoted in an article, and EEPI believed that he revealed confidential information in violation of its agreement with the University. (PageID.268.) In fact, senior management at Pharco (EEPI's parent company) sent Day an email stating he had breached the agreement between EEPI and the University. (PageID.268–269.) In response, Day sent seven emails that day to senior management at EEPI and to El-Sawy, threatening to invalidate the patent, not credit EEPI or El-Sawy when publishing papers or articles on the research, and to litigate the University's claim to the intellectual property "very aggressively." (PageID.269–271.)

Between August 30 and September 6, 2017, Day sent 48 messages of various forms to El-Sawy. (PageID.271–278.) Among these messages, Day stated that he removed El-Sawy's access to the research data and threatened to report EEPI and El-Sawy to the Ministry of Health in Egypt. (PageID.273.) Day also threatened to make sure El Sawy "will never work in science in the US" and ordered his laboratory staff to cease all communications with El-Sawy and EEPI. (PageID.274–275.) Day also threatened that if he had to fly to Egypt and address this with EEPI and El-Sawy in person, "it won't be pretty" (PageID.274.) Plaintiffs allege that Day's behavior was motivated by his animus against El-Sawy. (PageID.285.)

Following these events, the University unilaterally decided to suspend El-Sawy's pay for failure to perform her job duties, though she was only unable to perform these duties because Day prevented her from accessing the necessary research and databases. (PageID.280.) The University also scheduled a disciplinary conference to review El-Sawy's conduct on November 2, 2017. (PageID.282.) But, on November 7, that conference was put on hold. (*Id*.)

In the interim, on October 3, 2017, Plaintiffs filed a complaint against Day per the University's internal procedures, describing Day's threats to "invalidate everything." (PageID.281.)  In February 2018, El-Sawy met with University officials, including the Chair, Associate Chair, and Clinical Department Administrator of the Department of Urology. (PageID.283.) El-Sawy told them about Day's actions, including his discriminatory comments and threats to harm her career and reputation. (PageID.284–285.) EEPI and El-Sawy subsequently filed a second complaint with the University on March 16, 2018. (PageID.285.)

In addition to EEPI's complaint regarding Day's comments to El-Sawy, EEPI had several issues with the final research report, which the University agreed to submit under the Second Research Agreement. Plaintiffs complain that the conclusion in the final report "did not follow from the data" and was based on "scientifically unsound" methods. (PageID.286.) The University agreed that a "better" final report was due to EEPI, but it never submitted one. (PageID.288.) Plaintiffs allege that Day misled the University to "protect himself," resulting in the University failing to provide a satisfactory final report. (*Id*.)

In the coming months, it seemed as if El-Sawy and EEPI's complaints could be resolved. Day wrote two apology letters to El-Sawy as well as to senior management at EEPI and committed to publishing two research papers with El-Sawy. (*Id.*)

But, despite this progress, the University did not take any further actions regarding EEPI and El-Sawy's complaints, though Plaintiffs filed three more complaints with the University from November 2018 to June 2020. (PageID.286–289.) Plaintiffs believe Day's interference with the University's investigation led to the University's failure to respond to their complaints (PageID.305–306.)

## B.

Plaintiffs filed this suit in December 2020, and filed a First Amended Complaint in March 2021, asserting nine counts in total against Day. (ECF No. 14.) EEPI and El-Sawy assert three claims under 42 U.S.C. § 1983 (Counts I–III), one claim for tortious interference with contract (Count VII), and one claim for tortious interference with prospective business relationships (Count VIII). (PageID.290–299, 311–317.) El-Sawy (but not EEPI) asserts two claims under Michigan's Elliott-Larsen Civil Rights Act (Counts IV–V). (PageID.299–308.) And EEPI (but not El-Sawy) asserts a breach of contract claim (Count VI) and a fraud and/or negligent misrepresentation claim (Count IX). (PageID.308–311, 317–323.)

Day's motion to dismiss is now before the Court. (ECF No. 16.) Day moves to dismiss all claims except EEPI's breach-of-contract claim. (*Id.*)

The parties' positions are briefed adequately and the motions can be decided without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to EEPI and El-Sawy and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.

The Court begins with EEPI and El-Sawy's federal claims.

## A.

Plaintiffs bring three claims under 42 U.S.C. § 1983 against Day (Counts I–III). (PageID.290–299.) In Count I, Plaintiffs allege El-Sawy was constructively discharged on account of her sex, race, religion, national origin, and alienage in violation of the Fourteenth Amendment. (PageID.293.) In Count II, Plaintiffs allege Day created a hostile work environment in violation of the Fourteenth Amendment. (PageID.295.) And in Count III, Plaintiffs allege that Day viewed, approved, and encouraged the attempted religious conversion of El-Sawy by a co-worker, Catherine Day, in violation of the First Amendment's Establishment Clause and Fourteenth Amendment's Due Process Clause. (PageID.298.)

1.

Day argues that, to the extent EEPI is bringing § 1983 claims, it is barred from doing so "because a corporation cannot be the subject of discrimination." (ECF No. 16, PageID.360.) But, EEPI does not claim it was the subject of Day's discrimination. Instead, the allegations focus on Day's discriminatory conduct toward El-Sawy alone. Indeed, in their response, Plaintiffs state that they "do not allege that Defendant discriminated against EEPI…" (ECF No. 17, PageID.387.) Because Plaintiffs have not pled that Day discriminated against EEPI in violation of the First and Fourteenth Amendments, Counts I through III will be dismissed with respect to EEPI.

2.

Day next argues that El-Sawy's §1983 claims are untimely.

The statute of limitations is an affirmative defense, *see* Fed. R. Civ. P. 8(c), and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim, *see* Fed. R. Civ. P. 8(a) (requiring "a short and plain statement of the claim"); *Jones v. Bock,* 549 U.S. 199, 216 (2007). "For this reason, a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). "But, sometimes the allegations in the complaint affirmatively show that the claim is time-barred. When that is the case . . . dismissing the claim under Rule 12(b)(6) is appropriate." *Id.* (citing *Jones*, 549 U.S. at 215) ("If the allegations . . . show

9

that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]").

The statute of limitations for § 1983 claims comes from the analogous state statute of limitations for personal injury actions. *Crabbs v. Scott*, 880 F.3d 292, 294–95 (6th Cir. 2018). In Michigan, the three-year statute of limitations contained in Michigan Compiled Laws 600.5805(8) is the uniform limitations period applied to § 1983 claims. *Carrol v. Wilkerson*, 782 F.2d 44, 45 (6th Cir. 1986). "Although the applicable time period is borrowed from state law, the 'date on which the statute of limitations begins to run in a § 1983 action is a question of federal law.'" *Howell v. Farris*, 655 F. App'x 349, 351 (6th. Cir. 2016) (quoting *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007)). And "Under federal law, as developed in this Circuit, the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of [their] injury has occurred." *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). Stated differently, "[i]n determining when the cause of action accrues in § 1983 cases, we look to the event that should have alerted the typical lay person to protect [their] rights." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003). The Court must therefore look at when the harm in question occurred, guided by the principle that "[a] plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier*, 742 F.2d at 273.

This action commenced on December 30, 2020 when El-Sawy and EEPI filed their original complaint. (ECF No. 1.) But then Plaintiffs filed an amended complaint in March 2021. (ECF No. 14.) Federal Rule of Civil Procedure 15(c)(1)(B) provides that an amendment to a pleading "relates back" to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out in the original pleading. Here, both the original complaint and the amended complaint are based on the same underlying conduct and both allege constitutional, contractual, and other tort claims. (ECF Nos. 1, 14.) Day had adequate notice of the nature and scope of the allegations in the amended complaint, which satisfies the requirements of Rule 15(c)(1)(B). *See Hall v. Spencer Cnty., Ky.*, 583 F.3d 930, 934 (6th Cir. 2009). So El-Sawy's § 1983 claims must have accrued after December 30, 2017, or three years before the original complaint was filed, to fall within the statute of limitations.

El-Sawy's hostile-work-environment claim is untimely. The complained-of conduct, which includes Day using profanity toward El-Sawy, making comments regarding his status as a white American male, and incessantly texting, calling, and emailing El-Sawy with threats and demands, all occurred in August and September 2017, if not earlier. (*See* PageID.265-368; PageID.269-379.) Though the complaint does contain allegations within a three-year window, these involve Day's refusal to cooperate with El-Sawy in the publication of research papers and Day's interference with the University's investigation. (PageID.289, 306.) The allegations do not describe work conditions, however, which is the central inquiry in a hostile work

environment claim. *See Vonderhaar v. Waymire*, 797 F. App'x. 981, 992 (6th Cir. 2020) (holding that work conditions must be "objectively intolerable" to show hostile work environment under the Equal Protection Clause.) In other words, to the extent the complaint alleges a hostile work environment, that environment existed more than three years before Plaintiffs filed suit.[2]

El-Sawy's only response to Day's statute of limitations argument is that "Plaintiffs' claims accrued when they knew that Defendant's actions had caused the destruction of their business relationships with UM. That was in 2019 at the earliest." (ECF No. 17, PageID.391.) She relies on Michigan case law for this argument. (*Id.* (citing to *Frank v. Linkner*, 500 Mich. 133, 150 (2017)).) But accrual of § 1983 claims is determined by federal law, which provides that accrual occurs when "plaintiff knows or has reason to know that the act providing the basis of [their] injury has occurred." *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). In September 2017, El-Sawy knew or had reason to know that Day's hostile actions, which are the cause of her alleged emotional distress and cardiac problems, had occurred. (*See* PageID.279.) And, as Day points out, El-Sawy hired a lawyer and filed a complaint with the University in October 2017, indicating she was aware of the underlying action that caused her harm at that point. (*See* PageID.281.) Therefore, the complaint affirmatively shows that El-Sawy's

---

[2] El-Sawy does not argue the continuing violation doctrine applies to her hostile work environment claims. And the complaint does not allege any specific behavior by Day that occurred within the limitations period that would support application of the continuing violation doctrine. So the Court does not consider it here.

hostile work environment claim is barred by the statute of limitations. Count II will be dismissed.

Similarly, El-Sawy's Establishment Clause claim is barred by the statute limitations. El-Sawy was alerted to the alleged violation when Catherine Day attempted to convert her to Christianity and when Day tacitly approved and encouraged these actions. (PageID.298.) Although short on specifics, the complaint does state that Catherine Day attempted to convert El-Sawy "[d]uring their interactions in Day's laboratory…" (PageID.268.) El-Sawy was back in Egypt as of August 30, 2017, and there is no indication that she was present in Day's lab after this date. (*See* PageID.270.) So, by the end of August, El-Sawy was no longer "in Day's laboratory," which, according to Plaintiffs, is where Catherine Day attempted to convert her. The Court concludes that on the face of the complaint, the events that give rise to El-Sawy's Establishment Clause claim occurred before December 30, 2017 and the claim is barred by the statute of limitations. Count III will be dismissed.

But Day has not met his burden of showing that, on the face of the complaint, El-Sawy's constructive-discharge claim is barred by the statute of limitations. A constructive-discharge claim does not accrue until a plaintiff leaves their employment, as that is the event that alerts them to protect their rights. *See Trzebuckowski*, 319 F.3d at 856; *see also Bohler v. City of Fairview*, 2018 WL 5786234, at *3 (M.D. Tenn. Nov. 5, 2019) (holding that, under Equal Protection Clause, "claims for constructive discharge accrued on the day [Plaintiff] submitted his resignation" (citing *Green v. Brennan*, 578 U.S. 547 (2016))). Here, it is unclear from the complaint

13

when El-Sawy left her employment with the University. But taking El-Sawy's allegations as true, it is reasonable to infer that El-Sawy left her employment with the University sometime after December 30, 2017. For instance, in November 2017, El-Sawy's disciplinary review conference was put on hold while the department and HR further considered the matter. (PageID.282.) And in February 2018, El-Sawy met with University representatives to discuss "the pattern of abuse and discrimination that she suffered while working under Day," indicating El-Sawy may still be working with the University. (PageID.284.) In April 2018, Day "committed to collaborate" with El-Sawy on two research papers. (Page.ID.285.) And, as of December 21, 2018, the investigation into El-Sawy and EEPI's complaints about Day was ongoing. (PageID.287.) True, the complaint does not expressly allege that El-Sawy was still employed when these events occurred. But it is Day's burden to show that the statute of limitations bars El-Sawy's claims, which he has not done because these events permit a reasonable inference that El-Sawy was employed by the University in 2018. So, Count I will not be dismissed on statute of limitations grounds.

3.

Because it is plausible that El-Sawy's constructive-discharge claim is timely, the Court considers Day's argument that this claim must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

The parties dispute whether El-Sawy must specifically plead that she resigned or quit her employment to plausibly allege a claim for constructive discharge. The central inquiry at this stage is whether El-Sawy has made a plausible claim that the

working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. *See Russell v. Drabik*, 24 F. App'x. 408, 414 (6th Cir. 2001). Day does not contest that El-Sawy has adequately pled that she faced objectively difficult or unpleasant work conditions. And El-Sawy has pled that she has left her position at the University because of the environment Day created (PageID.293.) Day argues that El-Sawy's contract may have "run out" (ECF No. 18, PageID.408), or that "she never left" (ECF No. 16, PageID.363). But these are factual contentions Day may make at a later stage. At the motion to dismiss stage, El-Sawy contends that it was Day's discriminatory and retaliatory actions that caused her to leave her position at the University, and the Court must accept this as true for the purposes of this motion.

Also, there are sufficient allegations within the complaint that El-Sawy left her position at the University. El-Sawy alleges that she was unable to complete her job responsibilities because Day prevented her from accessing necessary data and materials. (PageID.280.) After El-Sawy brought this to the attention of the University, Day apologized and committed to collaborating on two papers with El-Sawy. (Page.ID.285.) But, despite El-Sawy's attempts to work with Day from April 2018 to January 2019, the papers were never completed. (*Id.*) Given that the "only purpose" of El-Sawy's employment was to "further her work on *A. maritima*" and that "there was no reason for [El-Sawy] to remain at U-M if she could not continue that work," the plausible inference from El-Sawy's allegations is that she left her

employment with the University after attempting, but failing, to collaborate with Day on the research and subsequent papers involving *A. maritima*. (*See* PageID.291.)

Day points out that the complaint does not expressly state that El-Sawy was not terminated, meaning that termination, rather than constructive discharge, would be why El-Sawy left her position. Though it is true that El-Sawy did not explicitly allege that she was not terminated, she does plead that her disciplinary review conference had been placed on hold on November 7, 2017, pending investigation into Day's actions. (Page.ID.282.) Taken together with the events involving El-Sawy and EEPI's complaints to the University, the Court concludes that there are sufficient allegations that show El-Sawy left her employment once she determined that Day would not work with her to publish the research papers.

The Court notes that, to the extent El-Sawy's Equal Protection claim alleges retaliation, it is barred. *See Russell v. Drabiki*, 24 F. App'x. 408, 411 (6th Cir. 2001); *Smith v. City of Inkster*, 644 F. App'x. 602, 611 (6th. Cir. 2005) ("A retaliation claim does not . . . arise under the Equal Protection Clause." (quoting *R.S.W.W., Inc. v. City of Keego Harbor,* 397 F.3d 427, 440 (6th Cir. 2005))).

Count I will not be dismissed, except to the extent it alleges retaliation.

## B.

The Court now considers Counts IV and V, which are claims of constructive termination and retaliation, respectively, under Michigan's Elliott-Larsen Civil Rights Act (ELCRA).

16

1.

Day raises the affirmative defense of statute of limitations in response to El-Sawy's ELCRA claims. The statute of limitations for ELCRA claims is also three years. *See McDaniels v. Plymouth-Canton Cmty. Schs.*, 755 F. App'x 461, 468 (6th Cir. 2018). The claim accrues when the discriminatory conduct occurs. *Id.* So, to be within the statute of limitations, the alleged discriminatory conduct must have occurred after December 30, 2017.

Both ELCRA claims fall within the three-year statute of limitations. For the retaliation claim, El-Sawy alleges that Day's retaliatory conduct includes refusing to collaborate with her on writing one or more scientific papers (PageID.306), not allowing her to use the research and data they had developed to further her work on *A. maritima* (*id.*), and interference with University audit procedures, (PageID.305). El-Sawy alleges that Day recommitted to publishing two research papers with El-Sawy in April 2018 (PageID.285), and that she attempted to collaborate with Day on these papers between April 2018 and January 2019, (PageID.289). El-Sawy also alleges that the University investigation was ongoing as of December 2018. (PageID.287.) Because the retaliatory actions occurred after December 30, 2017, they fall within the statute of limitations.

As discussed above, El-Sawy's ELCRA claim for constructive discharge is similarly not barred by the statute of limitations, as El-Sawy alleges there are events that caused her to leave her employment that occurred after December 30, 2017. Day

has not met his burden of showing that El-Sawy's constructive-discharge claim accrued before December 30, 2017. So it is plausible that the claim is timely.

2.

Aside from asserting that El-Sawy's ELCRA claims are time barred, Day claims that El Sawy has not adequately pled a claim for constructive discharge and retaliation under ELCRA. The Court disagrees.

To demonstrate constructive discharge under ELCRA, a plaintiff must show two things: the defendant deliberately created objectively intolerable working conditions and the defendant did so with the intention of forcing plaintiff to quit. *Weigold v. ABC Appliance Co.*, 105 F. App'x. 702, 708 (6th Cir. 2004).

In response to this claim, Day argues that El-Sawy has not adequately pled that she quit her employment with the University. But the central inquiry at this stage for a constructive-discharge claim is whether the plaintiff has alleged objectively intolerable work conditions that were imposed with the intent of forcing the plaintiff to quit. El-Sawy has met this standard. In addition to allegations about the abusive work environment, El-Sawy alleges Day prevented her from accessing the data they worked together to compile (PageID.275), threatened to prevent applications for new patents based on their research (*id.*), and at one point, stated that El-Sawy should "send your letter of resignation immediately," (PageID.276). El-Sawy also alleges that her only purpose in working for the University was to research and publish papers concerning *A. maritima*. (PageID.291.) These allegations are sufficient to show objectively intolerable work conditions that would lead a reasonable

18

person in El-Sawy's shoes to quit her employment. *See Weigold*, 105 F. App'x at 708 ("An employer is held to intend the reasonably foreseeable consequence of [their] conduct." (quoting *Jenkins v. Amer. Red Cross*, 369 N.W.2d 223, 229 (Mich. Ct. App. 1985))).

As far as El-Sawy's retaliation claim under the ELCRA, Day also states that El-Sawy did not allege that she was forced to quit her employment, which is the claimed adverse employment action that followed her protected activities. *See Khalaf v. Ford Motor Co.*, 973 F.3d 469, 488–89 (6th Cir. 2020) (quoting *Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014)). But, as the Court explained above, El-Sawy has made allegations that, as a result of her complaints about Day to the University, Day subsequently refused to collaborate with her to publish research. (PageID.306.) And, as explained above, her research is her purpose at the University. (PageID.301.) So El-Sawy has plausibly alleged that as a result of her protected conduct, she suffered adverse action.

Counts IV and V will not be dismissed.

## C.

The Court now turns to Plaintiffs' claims of tortious interference. Count VII is a claim for tortious interference with contract and existing business relationships and Count VIII is a claim of tortious interference with prospective business relations and economic advantage.

1.

Plaintiffs allege that Day interfered with three contracts: the First Research Agreement, Amendment No. 1, and the Second Research Agreement (together, the "Agreements"). (The Agreements are attached to Plaintiffs' complaint, and so the Court may consider them at this stage without converting the opinion to one of summary judgment. *See Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (providing that at the motion to dismiss stage, a court "may consider the Complaint and any exhibits attached thereto").) Day argues that El-Sawy is not a party to these Agreements. After reviewing the Agreements, the Court agrees. Since a necessary element of tortious interference with contract is interference with the plaintiff's contractual rights, El-Sawy has not stated a plausible claim. *See Knight Enter. v. RPF Oil Co.*, 829 N.W.2d 345, 348 (Mich. Ct. App. 2013) (holding that an element of a tortious-interference-with-contract claim is showing the defendant intended to invade the contractual rights of another). Count VII with respect to El-Sawy is dismissed.

But Michigan law recognizes tortious interference with contract as a distinct cause of action from tortious interference with business relationship or expectancy. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848–49 (Mich. Ct. App. 2005). Tortious interference with a business relationship requires the existence of a valid business relationship that is not necessarily predicated on an enforceable contract. *Id.* El-Sawy has pled that she held a position at the University to further her research and publish scientific papers. (PageID.291,

20

314.) El-Sawy also expected to continue her relationship with the University to further her professional career and reputation as a researcher. (PageID.290.) The complaint is sufficient to show that El-Sawy had a business relationship with the University, and therefore, she may proceed with her claim of tortious interference with business relationship. Count VIII is not dismissed with respect to El-Sawy.

2.

Day also raises a statute of limitations defense to El-Sawy and EEPI's claims of tortious interference. The Court reiterates that Day bears the burden of showing that the underlying events occurred after the start of the statute of limitations. And, as there was for Plaintiffs' § 1983 and ELCRA claims, there is a three-year statute of limitations for both claims of tortious interference. *See Blazer Foods, Inc. v. Restaurant Properties, Inc.*, 673 N.W.2d 805, 813 (Mich. Ct. App. 2003).

Day concedes that, among other conduct, Plaintiffs allege that their tortious interference claims are based on Day "manipulating U-M's investigation by, among other things, presenting a false version of events designed to protect his own position," and "[a]cting to prevent the discovery by EEPI or Ms. El-Sawy of the fraudulent, inadequate, unscientific, and invalid research performed by Day." (PageID.315.)

Day first argues that "Plaintiffs do not articulate when these acts took place . . ." (ECF No. 16, PageID.374.) But Plaintiffs do not have to address affirmative defenses in their complaint. Instead, Day must demonstrate that "the complaint affirmatively show[s] that the claim is time-barred." *Cataldo*, 676 F.3d at 547. Day

21

cannot meet this burden by attempting to shift the responsibility to Plaintiffs. Further, the complaint indicates that the underlying events of the tortious interference claim plausibly took place after December 30, 2017. For example, the complaint states that the University's investigation was ongoing as of December 2018. (PageID.287.) The Court notes that Plaintiffs state that as part of Day's efforts to prevent discovery of his interference with the Agreements and business relationships, he wrote apology letters to Plaintiffs in April 2018. (PageID.316.) This indicates that perhaps Day's interference took place prior to December 2017. But, it could plausibly also refer to Day interfering after Plaintiffs attended the February 2018 disciplinary hearing with University officials. (*See* PageID.283.) Plaintiffs were also reassured on May 28, 2019 that Day would issue a revised final report, but Plaintiffs have not received one. (PageID.288.) Overall, Day has not met his burden of showing that Plaintiffs' tortious interference claims are barred by the statute of limitations. Thus, the Court will not dismiss Counts VII and VIII on statute of limitations grounds.

3.

Day further contests EEPI's tortious-interference-with-contract claim on three grounds.

First, Day argues that the First Research Agreement and Amendment No. 1 are expired, and therefore, cannot form the basis of a tortious interference claim. (ECF No. 16, PageID.369.) On this point, the Court agrees. The First Research Agreement states that it expires on June 30, 2013 (ECF No. 14-2, PageID.329.), but

Amendment No.1 extends the agreement to June 30, 2016, (ECF 14-2, PageID.335). EEPI does not allege that the First Research Agreement and Amendment No. 1 were renewed or extended beyond June 30, 2016. EEPI also does not respond to Day's expiration argument in its response brief. So, the Court finds that these two agreements were not valid beyond June 30, 2016 and cannot form the basis of a tortious interference of contract claim that accrued after December 30, 2017. Count VII will proceed based on a theory of tortious interference with the Second Research Agreement alone.[3]

Day next argues that he was a corporate agent for the University and so he cannot be liable for tortious interference unless he acted for his own benefit with no benefit to the University. (ECF No.16, PageID.370.) Even assuming Day is an agent of the University, which EEPI contests, there are sufficient allegations that show Day was not acting within the scope of his authority as an agent when interfering with the U of M/EEPI Second Research Agreement and that he acted solely for his own benefit, with no benefit to the University. *See Lawsuit Fin., LLC v. Curry*, 683 N.W.2d 233, 241 (Mich. Ct. App. 2004) (indicating that a plaintiff can maintain a tortious interference claim where the defendant-agent did not act within the scope of their employment). EEPI alleges that Day intentionally interfered with University

---

[3] The Court notes that the Second Research Agreement states it expired June 30, 2017, and there are no allegations in the complaint that the Agreement was renewed or amended to continue beyond that date. (*See* ECF No. 14-4, PageID.337.) But Day did not raise the argument of expiration with respect to the Second Research Agreement in his motion to dismiss. So, the Court will proceed to consider the claim of tortious interference with contract based on the Second Research Agreement.

audit procedures to tell an "inaccurate and misleading version of events" when the University investigated EEPI's and El-Sawy's complaints. (PageID.290.) Day also is responsible, allege Plaintiffs, for scientific misconduct while researching *A. maritimus*, including submitting a flawed final research report which was "scientifically unsound." (PageID.286–287.) Day offers no argument explaining how allegedly using improper scientific methods and interfering with University audit procedures would fall within his duties as an agent for the University or would benefit the University. Day's alleged interference with the subsequent audits also raises a plausible inference that he was acting in his own benefit to prevent the University from taking disciplinary action against him. Day's argument that his purported agency relationship with the University protects him from liability for tortious interference is therefore without merit.

And finally, Day argues that EEPI failed to allege that Day's interference with the Agreements caused the University to breach. (*Id.*, PageID.371.) This is contrary to EEPI's allegations. EEPI states that Day's interference with the University's scientific and financial audit resulted in the University failing to provide a scientifically reliable final report. (PageID.290.) This prevented the parties from moving forward with the next steps under the Second Research Agreement, which include the ultimate objective of developing a cancer drug using *A. maritima*. (PageID.263, 290.)  These allegations are sufficient to show that Day's interference caused the University to breach its contract with EEPI. Count VII will not be dismissed with respect to EEPI.

4.

Day similarly raises several issues with EEPI's claim of tortious interference with prospective business relations and economic advantage.

The Court's determination that Day may be liable for tortious interference of contract even as an agent of the University applies as well to the claim of tortious interference with prospective business relations.

Day next argues that none of EEPI's claims "remotely suggest" that Day's actions were done with the intent of causing the University to end its relationship with EEPI. *See Health Call of Detroit*, 706 N.W.2d 843, 890 (providing that a plaintiff must show "intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy").

The Court disagrees. EEPI alleges that Day targeted El-Sawy due to racial and religious animus and did so to "divert attention from himself for the failures to comply with the parties' agreements and the fundamental flaws in the purported final report." (PageID.269.) Day threatened to "void any position EEPI has on the patent" (PageID.270) and interfered with audit procedures to prevent the University from submitting a scientifically valid final report (PageID.290). So EEPI has sufficiently pled that Day took per se wrongful or malicious actions with the intent of causing the relationship between EEPI and the University to terminate. Count VIII will not be dismissed.

25

**D.**

Count IX is a fraud claim, or in the alternative, a negligent-misrepresentation claim, by EEPI against Day.

Day argues that the claim was not properly pled because EEPI did not allege that Day's misrepresentations induced EEPI to enter into the Second Research Agreement. (ECF No. 16, PageID.376.) Day is correct that the Second Research Agreement was already executed when Day made the alleged false statements.

But Day points to no case law or other reason why EEPI is limited to only arguing that Day induced EEPI to enter into the Second Research Agreement. To make a claim for fraud, EEPI must show that it "acted in reliance upon the misrepresentation." *See, e.g.*, *Kings Lane GP Inc. v. Kings Lane Ltd. Dividend Hous. Assoc. Ltd. P'ship*, 2018 WL 6331334, at *6 (Mich. Ct. App. Dec. 4, 2018). And contrary to Day's argument, EEPI identifies multiple actions it took in reliance upon Day's statements. EEPI has alleged that it paid for "numerous trips" Day took where he charged his expenses to EEPI. (PageID.318.) And EEPI says it paid because of Day's statement that he needed to explore new sources of the potential anti-cancer compound. (*Id.*) EEPI also agreed to allow Day to use *A. hispida* because of Day's statement that *A. hispida* would be a "suitable substitute" for *A. maritima*. (PageID.319.) And EEPI continued to fund and approve the project because of Day's statements that his methods and techniques were scientifically sound and would not affect the scientific validity of the preclinical phase. (PageID.321.) These allegations

specifically show that EEPI relied on Day's statements and based its actions on his representations.

Even if EEPI relied on his statements, Day says the statements regarding substitution for *A. maritima* were advice or recommendations about future actions, and so EEPI cannot show they were false when Day made them. (ECF No. 16, PageID.377.) The statements in the complaint, however, are not about future actions. Rather, the statements are about the scientific validity of certain methods that plausibly could be proven false. EEPI states that Day "falsely promis[ed] . . . that the techniques and methods being employed by Day, including his use of *A. hispida*, were scientifically sound and justified EEPI's investment of money in the Preclinical Phase" (PageID.320–321) and "that his experiments had generated positive, replicable results which could be used in the further development of an anti-cancer drug," (PageID.321).

Further, Day's citation to *Hi-Way Motor Co. v. International Harvester Co.* does not apply to the alleged false statements. *Hi-Way Motor Co.* states that there is a general rule "that broken promises of future action are not actionable torts." 247 N.W.2d 813, 817 (Mich. 1976). But the statements discussed above contain no promises from Day. Instead, they are factual statements about the methods employed by Day and the results of his research. These statements can be proven false. And they do plausibly show that Day made false representations to EEPI.

Finally, in his reply brief, Day argues that EEPI has not adequately alleged that Day owed it a duty, a required element of a negligent misrepresentation claim.

*See Unibar Maintenance Servs., Inc. v. Saigh*, 769 N.W.2d 911, 919 (Mich. Ct. App. 2009). This argument is not set forth in Day's motion to dismiss. "Arguments raised for the first time in a reply brief are generally not properly before the court." *Emmons v. Comm'r of Social Security*, 2014 WL 1304936, at *1 (E.D. Mich. Feb. 13, 2014).

In sum, Count IX is not dismissed for failure to state a claim.

## IV.

Accordingly, the Court GRANTS in part and DENIES in part Day's motion to dismiss Plaintiffs' claims (ECF No. 16).

To summarize, EEPI's Equal Protection constructive-discharge claim (Count I), Plaintiffs' hostile-work-environment and Establishment Clause claims (Count II and III), and El-Sawy's tortious-interference-with-contract claim (Count VII) are DISMISSED.

Remaining to be litigated are El-Sawy's Equal Protection constructive discharge claim (Count I), El-Sawy's ELCRA constructive discharge and retaliation claims (Counts IV and V), EEPI's breach of contract claim (Count VI), EEPI's tortious-interference-with contract claim (Count VII), the tortious-interference-with-business-relationships claim (VIII), and the fraud or negligent-representation claim (Count IX).

SO ORDERED.

Dated: October 6, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE